RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0105p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

HAROLD STAFFORD,

*Defendant-Appellant.*

No. 09-5749

_____

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 07-00221-001—Aleta Arthur Trauger, District Judge.

Decided and Filed: April 27, 2011

Before: KENNEDY, BOGGS and SUTTON, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Michael D. Noel, Brentwood, Tennessee, for Appellant. Byron M. Jones, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge. Harold Stafford set out to make money from a quaint phenomenon once known as rising home prices. The first premise of his plan was legitimate but mistaken—that residential real estate would continue to appreciate in value. The second premise of his plan was illegitimate and equally mistaken—that he could get away with filing a series of fraudulent loan applications to purchase the properties. When the predictable happened, a jury convicted him for violating several white-collar criminal laws, and a judge sentenced him to 96 months in prison. Because

1

ample evidence supports the conviction and because his other challenges come to naught, we affirm.

I.

The owner of a mortgage company, Stafford struck a deal with several sellers of luxury homes in suburban Nashville.  The quid:  Stafford would find buyers willing to purchase the homes for tens of thousands more than their listed prices.  The quo:  the sellers would give Stafford the difference between the sales price and the asking price.

To implement the scheme, Stafford recruited seven "straw buyers," people with good credit who wanted to invest in real estate.  Stafford referred the straw buyers to Miles Black and Jeffrey Hathcock, who ran a branch office of Allied Home Mortgage Capital Corporation.  Allied submitted loan applications on the buyers' behalf for "stated income" loans, which banks extend to borrowers, most often self-employed borrowers, who have difficulty proving their annual income.  So long as the borrower has a favorable credit score and the requisite debt-to-income ratio, many banks will approve a stated income loan without verifying the borrower's income.

All of this allowed Allied, at Stafford's direction, to submit several loan applications built on myths—that the applicants were wealthy, that they sought to purchase just one home and that they sought a mortgage for a primary residence, not a second home or an investment property.  The applicants, in truth, possessed none of these qualities.  They made modest salaries, bought several homes as investments and never intended to live in any of them.  Black, Hathcock and their employee Greg Arias forged the buyers' signatures on many of the loan applications.

To induce the buyers to lend their names, if not their true backgrounds, to this scheme, Stafford made three promises.  He would pay them a lump sum at closing to compensate them for investing in each house.  He would find renters willing to lease the homes initially and purchase them eventually, so that the rent payments could cover the mortgage payments until a final sale was made.  And he promised that the homes would appreciate in value, allowing the buyers to exit the loan obligations with a profit.

Stafford (largely) kept his first promise. He paid most of the straw buyers a portion of the kickbacks at closing. *But see* Tr. at 532–33, 546 (Stafford promised one of the straw buyers $100,000 for his home purchases, but the buyer "didn't get a penny").

The other promises fell victim to the vagaries of the housing market. As housing prices flattened and eventually collapsed, Stafford could not find renters to cover most of the mortgage payments, prompting the lenders to press the buyers to collect. At that point, Black, Hathcock and Arias disclosed the mortgage scheme to law enforcement officers and confessed to participating in it.

A federal grand jury indicted (1) Stafford on 51 counts of fraud, money laundering and conspiracy to commit fraud, and (2) Black and Hathcock on 25 related counts. *See* 18 U.S.C. §§ 2, 1343–44, 1349, 1957. Black and Hathcock pleaded guilty, and Stafford went to trial. A jury found Stafford guilty on all counts, and the district court sentenced him to 96 months in prison.

## II.

Stafford raises three arguments on appeal: (1) the evidence does not support the verdict; (2) the district court should have admitted prior inconsistent statements of a government witness; and (3) the court improperly enhanced his guidelines offense level.

### A.

In challenging the sufficiency of the evidence to support his conviction, Stafford faces a steep climb. *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006). He must show that, after construing the evidence "in favor of the government," *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007), no "rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Stafford principally claims that the government failed to prove that he "knowingly and willfully joined in an agreement with" Black and Hathcock to commit

fraud. *United States v. Cantrell*, 278 F.3d 543, 546 (6th Cir. 2001). Without a conspiracy, Stafford points out, a jury could not hold him liable for the fraudulent loan applications that Allied submitted, nor could his money laundering convictions stand because one "element[] of . . . money laundering [is] . . . knowledge that the funds are proceeds of unlawful activity." *United States v. Prince*, 214 F.3d 740, 747 (6th Cir. 2000); *see* 18 U.S.C. § 1957. Put another way, all of his convictions must fall in the absence of a conspiracy.

Ample evidence, however, supports the view that Stafford was in on the scheme and indeed hatched it. Start with the first straw buyers that Stafford referred to Allied. According to Hathcock's testimony, Stafford brought mortgage applications for Adam Cohen and Michael Henderson to Allied's office with these directions: "the mortgage loans were going to be . . . stated [income] loans, and they were going to be run [as] owner occupied." Tr. at 698. Several days later, Stafford brought Allied more mortgage loan applications for Cohen and Henderson. His instructions for the second loans echoed those for the first: "run them [as] . . . stated [income], owner occupied again, and . . . push them through pretty fast." Tr. at 704. Cohen submitted a third loan application through Allied, and Henderson submitted three more, all saying that Cohen and Henderson planned to live in the houses.

The same holds true for the other buyers. In all, Stafford referred seven straw buyers to Allied, who together bought 22 houses. Each of the loan applications sought a stated income, owner-occupied loan.

A reasonable jury readily could infer that Stafford knew that 22 houses could not serve as the primary residences for seven buyers and that Black and Hathcock thus would need to file fraudulent loan applications in order to "run them [as] . . . owner occupied." Plus, Stafford directed the co-conspirators to fill out the applications in just this way, permitting a jury to infer that the three men had entered into an agreement to file the fraudulent loan applications.

Other evidence comes to the same end. When Stafford referred Adam Cohen to Allied, Cohen worked for Stafford's firm. Stafford signed Cohen's paychecks, and thus

had ample reason to know that Cohen's income could not cover the mortgage payments on three luxury homes. Stafford nevertheless sent Cohen to Allied and directed Black and Hathcock to apply for stated income loans for the three homes' full value.

Add the experience of Uchendi Nwani, who purchased six houses through Allied. Nwani sent Allied his tax returns, which reported an annual income of $40,000 or so. Stafford told Nwani that the tax returns would not qualify for mortgage loans on luxury homes. Instead of turning Nwani away, Stafford provided him with false tax returns reporting an annual income of $200,000 and told Nwani to give the returns to Allied. Allied submitted the loan applications, even after knowing of Nwani's real as opposed to fictional tax returns, providing still further evidence of an agreement among Black, Hathcock and Stafford to commit fraud.

The testimony of Mark Mire, an IRS undercover agent, removes any remaining doubt. Mire played a video of a meeting in which Arias introduced Mire as a prospective buyer looking to invest in real estate. As part of his sales pitch, Stafford told Mire and Arias that "you usually buy about three or four" houses and that "[y]ou gotta get them all in there before it hits your [credit] bureau," App'x 96, before in other words the purchases appear on Mire's credit report for the lenders to discover. Mire then played an audiotape of a telephone conversation with Stafford. Mire asked whether he would have to "inflate [his] income" because he could not afford to buy several homes, and whether the homes would be listed as "primary residences." App'x 113. Stafford replied, "They know how to handle all of that. . . . Miles [Black] and Greg [Arias] got that—they have that part handled." App'x 113. Ample evidence supported the existence of a conspiracy.

Stafford makes one other argument with respect to the money laundering convictions—that he had no knowledge that the funds were the fruits of a crime. *See Prince*, 214 F.3d at 747. Yet this point cannot escape the reality that Stafford acted as a knowing member of a conspiracy to commit wire and bank fraud. The kickbacks he received from sellers and builders came from loans secured by fraud, and Stafford knew it. The evidence supports this conviction as well.

B.

Stafford argues that the district court should have admitted prior inconsistent statements of Uchendi Nwani, a government witness.  Nwani testified during cross-examination that he was not a millionaire and did not earn over $250,000 a year. Defense counsel sought to impeach Nwani with three publications, a book authored by him (*The Millionaire Ex-Convict*) and articles in *Ebony* and *Gospel Today* magazines about him, all saying he makes over $250,000 a year.  The rub was that the writings mentioned that Nwani had been convicted of a crime he had committed more than ten years earlier, evidence barred by Evidence Rule 609(b).

Stafford "concedes that evidence of the prior conviction was properly excluded," yet maintains that exclusion of the book and articles, "which indirectly made reference to his conviction, were improperly excluded and constituted prejudicial error."  Stafford Br. at 57.  The trial court, however, carefully navigated the competing considerations by restricting questioning in this way:  Defense counsel could ask Nwani whether "he's selling a book on the Internet that refers to [himself] as a millionaire without giving the title of the book," Tr. at 277; he could ask whether Nwani had told a magazine he earned over $250,000 a year; and, if Nwani denied either fact, defense counsel could confront him with the documents without putting them into evidence.  But neither the questioning nor any admitted exhibits, the court insisted, could reveal Nwani's prior conviction.

In his testimony Nwani admitted that the book and articles characterized him as a millionaire, but claimed that the statements in the publications were false.  Defense counsel drew out the discrepancies between his trial testimony and the writings, giving the jury ample bases for assessing Nwani's credibility.  Stafford offers no better way to manage the requirements of the rule, and we cannot think of one ourselves.  No abuse of discretion occurred.  *See United States v. Bender*, 265 F.3d 464, 470 (6th Cir. 2001).

C.

Stafford challenges three sentencing enhancements—for obstructing justice, for using sophisticated means to commit the crimes and for being an organizer of the conspiracy.

*Obstruction of Justice.*  The district court enhanced Stafford's offense level by two steps because he "obstructed or impeded, or attempted to obstruct or impede, the administration of justice."  U.S.S.G. § 3C1.1.  The enhancement applies when a defendant tries to "unlawfully influenc[e]" a potential witness by asking him to lie to investigators. *Id*. § 3C1.1 app. n. 4; *United States v. Haynes*, 98 F. App'x 499, 507 (6th Cir. 2004), *vacated and remanded on other grounds*, 543 U.S. 1112 (2005).  Stafford asked two buyers to do just that.  Nwani testified that Stafford "[t]old [him] don't talk to them and said the only thing they can get me on is tax evasion or money laundering or something like that."  Tr. at 225.  And Stafford told straw buyer Jeff Crenshaw that, if he faced questioning, "we can't say anything, we have got to stick together."  Tr. at 550.

Stafford protests that he simply did "what any person has a right to do":  advise Nwani and Crenshaw of their "constitutional right to remain silent."  Stafford Br. at 45.  That is one possibility, but it is not the only one, and above all it was not the one the district court credited.  Because the district court found that Stafford was telling Nwani and Crenshaw to impede any ensuing investigation of the mortgages and because that factual determination is not clearly erroneous, *United States v. McDonald*, 165 F.3d 1032, 1034 (6th Cir. 1999), the enhancement was appropriate.

*Sophisticated Means.*    Stafford adds that his conduct did not involve "sophisticated means," U.S.S.G. § 2B1.1(b)(9), as the conspirators did not engage in "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," *id.* § 2B1.1 app. n. 8(B).  The evidence tells a different story:  Stafford instructed Hathcock and Black to submit applications for stated income, owner-occupied loans; told straw buyers to purchase all of their houses in the same month before the purchases appeared on their credit reports; directed Allied to apply for

loans from different lenders; supplied Nwani with falsified tax returns; and otherwise misused his specialized knowledge of the mortgage industry to create and sustain this conspiracy.  That is sufficiently sophisticated to warrant the enhancement. *See United States v. Kraig*, 99 F.3d 1361, 1371 (6th Cir. 1996).

*Organizer or Leader.*  Stafford concludes by arguing that he was not the "organizer or leader" of the conspiracy.  U.S.S.G. § 3B1.1(a).  The district court permissibly found that Stafford laid the foundation for, and provided much of the infrastructure for, the conspiracy.  He recruited seven straw buyers, enlisted builders and others to sell them 22 homes and brought Black and Hathcock in on the scheme.  At each stage, he gave his confederates precise directions, all to the end of sustaining the ongoing enterprise.  Without Stafford's expertise, connections and command, the conspiracy would never have gotten off the ground.  Stafford met the requirements of an "organizer or leader" of the conspiracy. *See United States v. Cook*, 55 F. App'x 341, 342–43 (6th Cir. 2003).

III.

For these reasons, we affirm.