RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0270p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

              *Plaintiff-Appellee,*

    *v.*

DONNELL YOUNG,

              *Defendant-Appellant.*

No. 09-5823

_____

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 98-00038-13—John T. Nixon, District Judge.

Argued: October 13, 2010

Decided and Filed: September 21, 2011

Before: GIBBONS and WHITE, Circuit Judges; MALONEY, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** Mary E. Spears, GILROY & KAMMEN, Indianapolis, Indiana, for Appellant. Blanche B. Cook, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Mary E. Spears, Richard Kammen, GILROY & KAMMEN, Indianapolis, Indiana, Thomas F. Bloom, Nashville, Tennessee, for Appellant. Blanche B. Cook, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

_____

## OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge. Defendant–appellant Donnell Young pled guilty to conspiracy to distribute cocaine and crack cocaine and to intentionally kill

---

[*] The Honorable Paul L. Maloney, Chief United States District Judge for the Western District of Michigan, sitting by designation.

one or more persons in furtherance of a continuing criminal enterprise. As part of his guilty plea, Young preserved the right to appeal the district court's denial of his motions to dismiss based on the denial of his constitutional right to a speedy trial. He now argues that he suffered substantial prejudice due to delays in the trial court and that he is entitled to dismissal of the indictment with prejudice as a result of this constitutional violation. For the reasons set forth below, we affirm the decision of the district court.

I.

The case stems from the killing of Woody Pilcher in Oklahoma in 1997, a murder to which Donnell Young ultimately pled guilty twelve years later. The case produced 3,628 docket entries in the district court. Its scope and duration place it among the largest and most complex federal prosecutions ever undertaken. Because Young's appeal centers on a speedy trial claim, we limit discussion of the voluminous record to only those facts pertaining to the delay in his trial.

Young was initially arrested by the state of Oklahoma on August 16, 1997, but the parties agree, and the district court found, that for speedy trial purposes, Young's federal case began with the filing of the Second Superceding Indictment on November 20, 1998. Additional indictments followed on February 25, 1999, September 30, 1999, and September 27, 2002. The government filed a Notice of Intent to Seek the Death Penalty on October 29, 2002.

The case, at times, involved twenty-four other defendants and numerous motions to continue, join, sever, and dismiss. Young participated in many of these motions. Twice he moved to have his case severed from the other defendants. His first motion for severance, filed in March of 1999, was denied by the district court in July of that year. His second motion for severance, filed in November 2003, after the return of multiple superseding indictments, was granted on July 1, 2004.

The many pre-trial motions delayed the beginning of Young's trial. While at times he requested a speedy trial or wrote letters informing the court of the lengthy delay, Young mostly caused or contributed to the delay through his admitted "vigorous

motions practice" and through his own requests for continuances and his acquiescence in the requests of other defendants. As the government notes, "During the eleven years of instant litigation, Young has never opposed a requested continuance from any party, including the Government or any co-defendant."[1]

In December 2004, as the pre-trial motions phase was concluding, Young moved for separate guilt and penalty juries. After the district court granted Young's motion in April 2005, the government filed an interlocutory appeal with this court. Both Young and the government asked this court to expedite its decision, which it did, issuing an opinion in *United States v. Young (Young I)*, 424 F.3d 499 (6th Cir. 2005), on September 29, 2005. The government promptly requested immediate issuance of the mandate so that the district court could regain jurisdiction and the case could continue.

It was during the pendency of this first interlocutory appeal that Young filed his first motion to dismiss on grounds that his speedy-trial rights had been violated. The district court conducted a hearing after which it issued a ruling denying Young's speedy-trial claim. The district court found, "The Government has done nothing throughout the pendency of this case that could lead to the conclusion that it has intentionally or in bad faith delayed the trial. . . . It is not the case that either the Government or the Court have been negligent with respect to bringing Defendant Young to trial." *United States v. Young*, No. 3:98-00038, 2005 WL 3417305 at *6 (M.D. Tenn. Dec. 13, 2005). The district court denied Young's motion for several reasons, including Young's requests for continuance, Young's failure to object to the motions to continue by co-defendants, Young's failure to object to the government's request for continuance and his request

_____

[1]Evidence of Young's participation in delays includes the following: after co-defendants Eben Payne and Janice Kittrell moved to continue the trial in March of 1999, co-defendant Dwayne Belyue objected, but Young did not; when co-defendant Lameisha Anderson moved to continue in July 1999, co-defendant Derrick Eatmon objected and advised that he did not waive his right to speedy trial, but Young did not; in February 2000, Young joined a motion to continue with co-defendant Jamal Shakir, which the court granted; in July 2000, Young himself moved to continue and stated directly that his motion constituted excludable delay under the Speedy Trial Act; in January of 2001, Young again asked the district court to continue the trial, this time until spring of 2002; in February 2001 Young moved to dismiss on various grounds but did not raise his speedy-trial right; in May 2001 Young requested release on bond but again failed to mention speedy-trial claims; after co-defendant Pacia Shakir moved to continue, Young again did not object; and throughout 2003 Young made motions to sever his trial from other defendants and to change venue but failed to mention speedy-trial concerns. Finally the court set Young's trial for June 20, 2005, without any objection from him.

for an additional extension of time, and Young's frequent, complex motions that both "required the Court's careful and serious consideration" and could not be used by Young to claim a violation of his right to a speedy trial.

After Young's first motion to dismiss was denied, *voir dire* commenced. During *voir dire*, Young moved to exclude several government witnesses. The district court granted Young's request and denied the government's motion for reconsideration. This action led to a second interlocutory appeal to this court, which began on March 6, 2006, and took over two years to resolve. Ultimately, on July 18, 2008, this court reversed the district court's ruling and remanded for further proceedings on the admissibility of the previously excluded testimony. *United States v. Young (Young II)*, 533 F.3d 453 (6th Cir. 2008). The mandate returning the case to the district court issued on September 12, 2008.

Through the fall of 2008, the district court considered yet another motion by Young—this time to exclude another witness. Two hearings were held on the motion. At the first hearing, Young wanted an absent witness to be present, so the district court continued the hearing until November 3. Young moved for a further continuance of the hearing to November 25 and filed additional motions through the month of December. On January 11, 2009, Young filed his second motion to dismiss based on his denial of a speedy trial. *Voir dire* resumed the following day. On February 19, while *voir dire* continued, Young announced his intention to plead guilty. The district court denied Young's second motion to dismiss based on denial of a speedy trial on May 3. On May 30, Young pled guilty, reserving his right to appeal the denial of his speedy trial motions. On June 25, 2009, the district court sentenced Young to 40 years, and on July 7, Young filed a timely notice of appeal with this court.

II.

On appeal, Young argues that his constitutional right to a speedy trial was violated and that he is entitled to dismissal of the indictment with prejudice as the proper remedy for the violation of this right.

We agree with Young that the proper remedy for a violation of a defendant's constitutional speedy-trial rights is dismissal of the indictment with prejudice. *See United States v. Brown*, 498 F.3d 523, 530 (6th Cir. 2007) (citing *United States v. Jackson*, 473 F.3d 660, 664 (6th Cir. 2007)). Indeed, while such a remedy may seem "unsatisfactorily severe" because "a defendant who may be guilty of a serious crime will go free," the United States Supreme Court has held that dismissal is "the only possible remedy." *Strunk v. United States*, 412 U.S. 434, 439–40 (1973) (quoting *Barker v. Wingo*, 407 U.S. 513, 522 (1972)). Young is therefore correct that if this court finds that his Sixth Amendment speedy-trial rights have been violated, then the indictment should be dismissed with prejudice. But as we explain below, Young's Sixth Amendment rights were not violated; thus he is not entitled to dismissal of the indictment.

## III.

Young begins his argument by noting that the delay of eleven years between his indictment and his conviction is presumptively prejudicial. He asserts that this delay arose largely from systemic failures and should be charged against the government. Moreover, according to Young, the delay has caused him actual prejudice in the form of lost witnesses, lost memories, and lost records. For these reasons, he argues his constitutional right to a speedy-trial has been violated.[2]

When reviewing whether a defendant's Sixth Amendment right to a speedy trial has been violated, this court reviews legal questions *de novo* and factual questions for clear error. *Brown*, 498 F.3d at 530 (citing *Jackson*, 473 F.3d at 664).

The Supreme Court has specified four factors for evaluating a Sixth Amendment speedy-trial claim: (1) length of delay, (2) the reason for the delay, (3) the defendant's assertions of his right, and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530. None of the factors is "a necessary or a sufficient condition to the finding of a deprivation of the right of speedy trial," but the factors are related and "must be

---

[2]Young only alleges infringement of his constitutional speedy-trial right. He does not assert a claim under the Speedy Trial Act. 18 U.S.C. §§ 3161–3174.

considered with such other circumstances as may be relevant" in "a difficult and sensitive balancing process." *Id.* at 533. Because Young's claim depends on this balancing test, we initially consider each factor separately.

A.

The first *Barker* factor—the length of the delay—serves as a threshold or a "triggering mechanism" for a speedy-trial analysis. *Id.* at 530. The length is measured from the earlier of the date of arrest or the date of indictment. *United States v. Bass*, 460 F.3d 830, 836 (6th Cir. 2006) (citing *Maples v. Stegall*, 427 F.3d 1020, 1026 (6th Cir. 2005)). The district court found, and Young now agrees, that for purposes of his speedy-trial claim in this case, the length is measured from the date of his first federal indictment on November 20, 1998.

A court need only consider the other *Barker* factors if there has been "uncommonly long" delay. *Id.* This court has held that a delay of more than one year is presumptively prejudicial and triggers application of the remaining three factors. *Id.* (citing *Maples*, 427 F.3d at 1026). The length of time from Young's first federal indictment, in November 1998, to the date his guilty plea became final, in June 2009, is just short of eleven years. Young has therefore suffered presumptively prejudicial delay.

B.

The second *Barker* factor is the reason for the delay. Young argues that the delay is due to "systemic failures" such as the district court's failure to grant a severance and rule on motions in a timely fashion, the prosecution's failure to file timely motions, and this court's failure to issue a decision on the government's second interlocutory appeal in less than twenty-eight months. Young argues that he did not cause the delay and that it should be charged against the government.

To support his argument, Young relies on *Barker* and *Vermont v. Brillon*, 129 S. Ct. 1283 (2009). In *Barker*, the Supreme Court noted, "The government, and for that matter, the trial court are not without responsibility for the expeditious trial of criminal cases. The burden for trial promptness is not solely upon the defense." *Barker*, 407 U.S.

at 527 n.27 (quoting *Hodges v. United States*, 408 F.2d 543, 551 (8th Cir. 1969)).  In *Brillon*, the Supreme Court stated that "institutional problems" and other "[d]elay resulting from a systemic breakdown . . . could be charged to the State."  *Brillon*, 129 S. Ct. at 1292–93 (internal citations and quotation marks omitted).  Young asks us to hold that the district court's dilatory actions, the prosecutor's "failure timely to file responses and other documents," and the length of time it took this court to decide the second interlocutory appeal comprise "institutional problems" and "systemic breakdowns" that render the government responsible for the delay.

We have held before that dilatory district court action may justify granting a defendant's speedy-trial claim.  In *United States v. Graham*, 128 F.3d 372 (6th Cir. 1997), we granted a defendant's speedy-trial claim when a district court took eight years to resolve a discovery dispute and failed to appoint counsel for a co-defendant for over a year.  In those circumstances "much of the blame for the delay . . . [fell] on the government and on the district court."  *Id.* at 375.  Similarly, in *Maples*, we granted a defendant's speedy-trial claim when a state court took a long time to adjudicate an entrapment motion, in part because of a co-defendant's delay.  We found that the trial court "should have been vigilant about the co-defendant's dilatory filing" and that the trial court "'failed to assert itself in an attempt to move the process along.'"  *Maples*, 427 F.3d at 1028 (quoting *Graham*, 128 F.3d at 373).

While these cases demonstrate the propriety of examining the district court's role in any delay, Young's case is not analogous to them.  In *Graham* the delay in the discovery decision was prompted by "the government's refusal to turn over requested discovery materials," which made the government *ipso facto* responsible for the delay, no matter how long it took the district court to ultimately rule on the motion. *Graham*, 128 F.3d at 374.  In contrast, in Young's case the district court found no evidence that the government was negligent in moving the case forward.  In *Maples*, where we found that the trial court "failed to assert itself" in moving the process along, there were "very few motions;" therefore, the trial court's dilatory action was inexcusable.  *Maples*, 427 F.3d at 1027–28.  In contrast, Young's case has generated 3,628 docket entries related

to "complex motions"—many of them filed by Young. When a party makes motions, it cannot use the delay caused by those motions as a basis for a speedy-trial claim. *See United States v. Loud Hawk*, 474 U.S. 302, 316–17 (1986) ("'Having sought the aid of the judicial process and realizing the deliberateness that a court employs in reaching a decision, the defendants are not now able to criticize the very process which they so frequently called upon.'" (quoting *United States v. Auerbach*, 420 F.2d 921, 924 (5th Cir. 1969))).

Nor does the record support Young's claims that the district court was dilatory and that the prosecution is to blame for the delay. Rather, the record shows that Young himself caused most of the delay. In addition to the motions practice discussed above, Young twice requested a continuance, acquiesced to the continuances sought by other parties, and when the government made its only request for a continuance, agreed with that continuance *and* asked for additional time. In *Barker*, the Supreme Court emphasized that "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 532. The district court found, as a matter of fact, that Young repeatedly failed to assert his right from November 20, 1998, until his first motion to dismiss on September 27, 2005. In light of the large record of motions and continuances, we find that the district court did not clearly err in denying Young's speedy-trial claim in his first motion to dismiss.[3]

The record is equally problematic for Young in the period from September 2005 to the present. The district court found, in denying Young's second motion to dismiss, that "both parties, as well as the Court, worked diligently to resolve pretrial issues and resume jury selection." [(DE 3507 at 6.)] This finding was not clear error. The district court did not have jurisdiction during the second interlocutory appeal. When it did have

---

[3]Young asserts that the district court failed to rule on a motion to sever for five years. This argument is factually wrong. Young's first motion to sever was filed in March of 1999 and denied less than four months later in July of that year. Young did not move for severance again until November of 2003, and the district court granted severance in July of 2004. At most the district court took one year to decide Young's motions, during which time numerous other motions were also filed and resolved.

Young also asserts that he was delayed because of inadequate funding. The district court found this was factually false. Young's motions for additional funding came during a time period when the court had already granted a continuance, so no delay because of lack of funding occurred.

jurisdiction, the district court held hearings on excluding a witness and continued with *voir dire*.

This leaves Young's claim that this court's twenty-eight month delay in adjudicating the second interlocutory appeal was a "systemic breakdown" that justifies granting his speedy-trial claim. However, because the second interlocutory appeal took place after *voir dire* had begun, we first consider whether a defendant is able raise a speedy-trial claim with regard to time after the commencement of *voir dire*.

This Court has already established that, for purposes of the Speedy Trial Act, the trial begins with *voir dire*. *United States v. Crane*, 776 F.2d 600, 603 (6th Cir. 1985) (citing *United States v. Gonzales*, 671 F.2d 441 (11th Cir. 1982)). Indeed, the very question of when trial begins has already been briefed by the parties in this case. *See Young II*, 533 F.3d at 460–61. The panel in *Young II* held that trial begins with *voir dire* in regard to a defendant's right to a list of witnesses under 18 U.S.C. § 1342. *Id.* However, we have not stated definitively when trial begins for *constitutional* speedy-trial purposes.

The Supreme Court has determined that the stage in trial in which certain rights attach varies depending on the constitutional right in question. For the purposes of the Fifth Amendment Double Jeopardy Clause, jeopardy does not attach until the jury is empaneled and takes the oath. *Serfass v. United States*, 420 U.S. 377, 388 (1975). Conversely, Sixth Amendment assistance of counsel rights begin after judicial proceedings have been initiated against the defendant by a preliminary hearing, indictment, information, or arraignment. *Brewer v. Williams*, 430 U.S. 387, 398 (1977). Most notably for this case, in discussing a criminal defendant's Sixth Amendment right to be present, the Supreme Court noted: "[I]n affirming *voir dire* as a critical stage of the criminal proceeding . . . 'Where the indictment is for a felony, the trial commences at least from the time when the work of empaneling the jury begins.'" *Gomez v. United States*, 490 U.S. 858, 873 (1989) (quoting *Lewis v. United States*, 146 U.S. 370, 374 (1892)). Because both *Brewer* and *Gomez* deal with Sixth Amendment rights, while *Serfass* deals with a Fifth Amendment right, consistency suggests that Sixth Amendment

speedy-trial rights should be treated similarly to other Sixth Amendment rights. Accordingly, we hold that for constitutional speedy-trial claims, trial begins with *voir dire*.

Because we have already found Young's arguments for the time period prior to *voir dire* meritless, this holding would normally dispose of Young's claim; however, we have previously held that, for purposes of the Speedy Trial Act, "a district court may not attempt to evade the spirit of the Act by conducting *voir dire* within the statutory time limits and then ordering a prolonged recess with an intent to pay mere 'lip service' to the Act's requirements." *United States v. Scaife*, 749 F.2d 338, 343 (6th Cir. 1984) (citing *United States v. Richmond*, 735 F.2d 208, 211 (6th Cir. 1984)). Arguably, in the constitutional context, if the beginning of *voir dire* were a pretense, a constitutional speedy-trial claim might be preserved.

Assuming the theoretical viability of such a claim, the initiation of *voir dire* was not a pretense. To be sure, it was a lengthy process, spanning three-and-a-half months, but there is nothing to suggest that *voir dire* was anything other than a legitimate jury selection process. And, the district court correctly found that the 28-month period for the interlocutory appeal did not constitute excessive delay under *United States v. Loud Hawk*, 474 U.S. 302 (1986). Under *Loud Hawk*, a party having sought the aid of judicial process cannot, in general, complain about the length of the process. 474 U.S. at 316–17. The *Loud Hawk* court found that a delay resulting from an interlocutory appeal would count against the government if the appeal were "clearly tangential or frivolous," but a "reversal[] by the Court of Appeals [is] prima facie evidence of the reasonableness of the Government's action." *Id.* at 316. In Young's case, the government's interlocutory appeal concerned an excluded witness, not a "tangential or frivolous" matter, and the government ultimately prevailed, establishing the reasonableness of its action. *Young II*, 533 F.3d at 466.

Young asserts that *Brillon*, decided between the district court's denial of his second motion to dismiss and this appeal, changes the *Loud Hawk* analysis. However, Young's argument fails. *Brillon* states that "delay resulting from a systemic breakdown"

can be charged to the state, but the delay in *Brillon* was disorganization in the Vermont public defender's service, not delay in an interlocutory appeal, and the case ultimately resulted in the defendant's loss of his speedy-trial claim. *Brillon*, 129 S. Ct. at 1292–93. *Brillon* did not overrule *Loud Hawk* or even reference it, aside from one parenthetical citation. *Id.* at 1290. Thus we find that *Brillon* has not overturned *Loud Hawk* and that the district court did not err by not counting the interlocutory appeal against the government.

There has been lengthy delay in Young's case, but the reason for that delay is mostly attributable to Young, not the government. Thus, Young has not satisfied the second *Barker* factor.

C.

The third *Barker* factor is whether the defendant asserted his right. The parties do not dispute this matter—they agree that Young did, at least, assert his right. However, the government would have us find that Young's surrounding conduct "eviscerates his ability to demonstrate that he was at all interested in being tried." As noted above, Young repeatedly asked for and joined continuances. Young also never filed a motion for an immediate trial; he did not assert his right to a speedy trial in letters he wrote to the court; and he filed his first motion to dismiss while the district court lacked jurisdiction because of the first interlocutory appeal. Taken together, these facts show that while Young may have asserted his right, he never did so in a manner that firmly demanded he be tried. The district court found: "Defendant asserted his right to speedy trial on more than one occasion, however given Defendant Young's other actions these assertions are given less weight." *Young*, 2005 WL 3417305 at *8. This finding is in keeping with the record and does not show clear error. Therefore, we find that Young has asserted his right but that in the *Barker* balancing test, this fact has little weight because Young never actively sought trial.

D.

The final *Barker* element is prejudice to the defendant.  The prejudice prong exists to protect three interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532.  "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*

Young makes two arguments regarding prejudice.  First, he stresses the "anxiety and concern of the accused" test.  Young notes that his prosecution was "one of the (if not the single) longest-running federal capital cases in the country" and that during his pre-trial incarceration time he was "unable effectively to distract or better himself through education, because of the limited opportunities and resources available to pretrial detainees."  The anxiety of his detention was magnified by his uncertainty over whether he would be sentenced to die.  Second, Young argues that his defense was actually prejudiced by the delay first because of the death of three witnesses who, Young argues, would have provided exculpatory evidence; second, because of the death of other witnesses who may have helped him construct a case in mitigation; and third, because of the loss of medical and mental health records which would have provided insight into Young's childhood, "an important topic of mitigation."  Young notes that "changed circumstances" led him to plead guilty, implying that he pled guilty to avoid the death penalty because the delay had so prejudiced his defense that trial would be foolhardy.

Young's generalized prejudice arguments have been recognized by the Supreme Court.  The *Barker* Court explicitly noted, "[T]ime spent in jail awaiting trial has a detrimental impact on the individual. . . . [H]e is . . . disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility." *Barker*, 407 U.S. at 532–33 (citation omitted).  Additionally, the *Barker* Court stated, "If witnesses die or disappear during a delay, the prejudice is obvious." *Id.* at 532.

But the prejudice argument is not as simple as Young claims, and the factors ultimately weigh against him.  In this circuit, "[w]hen the government prosecutes a case

with reasonable diligence, a defendant who cannot demonstrate how his defense was prejudiced *with specificity* will not make out a speedy trial claim no matter how great the ensuing delay." *United States v. Howard*,  218 F.3d 556, 564 (6th Cir. 2000) (citing *Doggett v. United States*, 505 U.S. 647, 656 (1992) ("[I]f the Government had pursued [the defendant] with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail. Indeed, that conclusion would generally follow . . . however great the delay, so long as [the defendant] could not show specific prejudice to his defense.")) (emphasis added).  Because the district court determined, as a factual matter, that the government was diligent in its prosecution, Young must show specific prejudice to his defense.   Moreover, we have found that specific prejudice must be "substantial prejudice" for a defendant to prevail on a speedy-trial claim. *United States v. White*, 985 F.2d 271, 276 (6th Cir. 1993).  Applying these standards, the district court found that the government had been diligent in its prosecution and that Young and the government "suffer equal prejudice due to the unavailability of witnesses."  *Young*, 2005 WL 3417305 at *9.  Thus Young had not suffered the "substantial prejudice" needed to prevail on his speedy-trial claim. *Id.*

To the extent that the district court ruled on Young's prejudice claims, its factual findings are reviewed for clear error. *See Brown*, 498 F.3d at 530.  There is no evidence contravening the district court's findings; nor does Young challenge them directly. Thus, we affirm the district court's findings that, as of 2005, the loss of witnesses was equally prejudicial to Young and the government.[4]

In the instant appeal, Young makes arguments about the loss of specific witnesses who were not addressed in either of the district orders.  The witnesses named by Young are Dana Davis, Wallace Davis, and Walter Walker.

---

[4] There are no district court factual findings about prejudice from loss of witnesses subsequent to the 2005 resolution of the first motion to dismiss.  In Young's second motion to dismiss, he made a legal argument that the reason for the delay should be analyzed under *Brillon* and that the delay therefore was attributable to the government.  Thus, in considering the motion, there was no occasion for the district court to make factual determinations.

Dana Davis died prior to the filing of Young's first motion to dismiss. Young claims that Davis's unavailability impaired his ability to impeach Cornelius Humphrey, a government witness who was present at the murder, and deprived him of an important alibi witness. Young fails to explain how Davis, who also was present at the murder and participated in it, might have provided an alibi for Young, and he did not list Davis as an alibi witness prior to trial as required by Rule 12.1 of the Federal Rules of Criminal Procedure. He does not in any way describe Davis's expected alibi testimony. Young also claims that Davis had given a statement to the FBI saying that Humphrey had been sent to Oklahoma with the specific mission of participating in Pilcher's murder. Young apparently believes that this statement would impeach Humphrey's position that he had no role in the murder. This argument advances Young's prejudice claim only minimally. Humphrey was admittedly at the scene of the murder with a weapon, and he was one of the government witnesses prepared to identify Young as the shooter. Young also confessed to another inmate that he was the shooter. Whether or not Humphrey was sent to Oklahoma to take part in Pilcher's murder has little to do with what Young's role was and seems unlikely to have influenced the trial in any significant way.

Wallace Davis had been killed in 1998. Clearly, this complex case could not have gone to trial before his death. Thus, any delays had nothing whatever to do with making him unavailable. In any event, Young's only representation about Davis's testimony is that he was aware that Humphrey was at the murder scene with a weapon, facts which were not in dispute. Young also speculates that Davis's failure to seek to stop the events might have provided some "fertile grounds" for cross-examination, without specifying what witness might have been cross-examined about this or how such cross-examination might have been helpful to Young.

The third witness mentioned by Young is Walter Walker, husband of Mary Walker, a witness who saw Young walk away from the scene of the murder. According to Young, Walter Walker was with Mary Walker at the time but did not share her observation. Without more, it is hard to evaluate any significance Walter Walker's testimony might have had. Mary Walker knew Young and had a basis for recognizing

him.  Moreover, a good deal of evidence would have established Young's presence at the crime scene.  Walker's unavailability cannot provide the requisite specific prejudice.

Finally, Young asserts that important mitigation witnesses and records were lost.  The evidentiary support for this claim is a 2005 declaration from one of Young's attorneys, primarily focused on the issue of funding delay.  The declaration does not specify what the testimony of any of the unavailable witnesses might have been, even in a general way.  As for the records, the declaration never states that the records were available at the inception of the case and became unavailable because of delay.  Moreover, nothing precluded Young's counsel from obtaining these records early in the case, or soon after the government gave notice of its intent to seek the death penalty in 2002.  Counsel indicates that the records were not obtained because of a delay in obtaining additional funding for a mitigation specialist after initial funding for the specialist had been exhausted.  A mitigation specialist was not required to obtain pertinent records, even though counsel might have preferred to have had the services of one.  Young has not shown that delays in this case affected his ability to prepare a mitigation case.

The unavailability of the three witnesses and the claimed loss of mitigation evidence do not constitute substantial prejudice.  Because Young has failed to show substantial prejudice, we conclude that his speedy-trial claim fails as to the fourth *Barker* element.

E.

Taken as a whole, the *Barker* factors weigh against Young.  While we are aware this case has unusual facts—especially the eleven-year delay from indictment to sentencing—they do not ultimately support a speedy-trial claim.  Young was either responsible for or a participant in most of the delay, and he is unable to show that his defense was prejudiced.  Clearly, finding ways to more quickly move this case forward would have been preferable to the actual pace of proceedings.  But the case was extraordinary in its complexity and otherwise.  Ultimately, while the length of Young's case may be atypical, it is not unconstitutional.

IV.

For the foregoing reasons, we affirm the decision of the district court.