**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 21a0150n.06**

**No. 20-3201**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| | ) | |
| BRUCE LEE FELIX, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**FILED**
Mar 23, 2021
DEBORAH S. HUNT, Clerk

BEFORE: BATCHELDER, GRIFFIN, and BUSH, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendant Bruce Felix robbed two metro-Cincinnati banks within four months in 2015. He raises three discrete issues in this appeal arising out of his multiple convictions in connection with those robberies: (1) the admission into evidence of a prior bank-robbery conviction; (2) the method used to secure witnesses' voice identifications of Felix; and (3) the delay in his trial under the Speedy Trial Act and the Sixth Amendment. We affirm.

I.

This criminal appeal stems from two bank robberies in the western-Cincinnati suburbs, the Cincinnatus Savings & Loan in Colerain, Ohio, and the Cheviot Savings Bank in Harrison, Ohio. The robberies were remarkably similar. Both occurred as the banks were opening on a Wednesday morning around 8:00 am. Both involved a masked and gloved man brandishing a gun who forced

his way inside. And in both instances, the man required the employees to disable the alarm and then restrained them with pre-set zip-ties. The robber netted over $240,000 from the banks' vaults.

Following receipt of a letter penned by Tara Love, law enforcement officials focused on Felix as a suspect. Love was his girlfriend at the time of the robberies and provided authorities with significant information linking him to both. She explained to the police that she and Felix were struggling financially and were without gainful employment before the robberies. According to Love, on the morning of the Cincinnatus robbery, Felix "came running in the house and woke [her] up and showed [her] the bag of money that he had stole," and described how he robbed the bank (including his use of a plastic gun to force his way inside and black zip-ties to neutralize employees). Felix then gave her $15,000, and "packed a bag and went to Tennessee." Felix made several large cash purchases for lavish items after the Cincinnatus robbery, including a Corvette, a Cadillac Escalade, a trailer, a vacation to Myrtle Beach, South Carolina, and a diamond engagement ring. On the morning of the Cheviot robbery, Felix "told [Love] that he had robbed a Cheviot Savings and Loan," and again described his methods (including his use of a silver gun and white zip-ties). Felix again gave her cash and left. Love matched his clothing the day of the Cheviot robbery (a blue jean jacket, a camouflaged hat, and a face mask) and the car he used (Escalade) to what bank employees identified. Love also permitted law enforcement officials to search her residence, where they discovered gloves, black zip-ties, a mask, and a receipt from the Taco Bell located eighty yards from the Cheviot bank dated two weeks before that robbery.

This information led officials to secure a voice recording of Felix from an unrelated traffic stop, which they then presented to bank employees to see if they recognized his voice as the robber's. Some, but not all, employees identified in varying degrees Felix's voice. Law enforcement officials also found at another residence more physical evidence linking Felix to the

robberies—pre-zipped white zip-ties, another pair of gloves, and a facial mask. And they obtained records establishing that within days after the robberies, Love and Felix became current on bills and Felix made significant cash buys at local casinos. Finally, officials discovered that Felix had a previous conviction for armed bank robbery.

Based on this and other evidence, a jury convicted defendant on one count of bank robbery (for the Cincinnatus bank), one count of armed bank robbery (for the Cheviot bank), and one count of using or carrying a firearm during a crime of violence (for the Cheviot bank). The district court sentenced him to serve a total of three hundred months and one day in prison. He timely appeals.

II.

Felix's first claim of appeal deals with a 1996 robbery of another metropolitan-Cincinnati bank (a Huntington Bank in Florence, Kentucky), also on a Wednesday around 8:00 am. With his face covered (this time with a bandana), Felix pointed a gun, forced his way inside, tied up employees, and ultimately netted over three-hundred thousand dollars from the bank's vault. After the robbery, Felix traveled to Las Vegas to gamble. But unlike the instant offenses, that robbery involved two accomplices; one was an employee (at whom Felix pointed his gun) who told Felix that the bank was going to get its cash delivery on the Wednesday morning, and the other (the employee's boyfriend) also entered the bank with him. Felix ultimately pleaded guilty to armed bank robbery and possessing a firearm during a crime of violence and was sentenced to 123 months in prison.

The district court permitted the introduction of this evidence under Federal Rule of Evidence 404(b)(2), which allows the admission of "other crimes, wrongs or acts" for the purpose of "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," among others. In a comprehensive written opinion, the district court

concluded that Rule 404(b)(2) permitted admission of the prior robbery to show both identity and modus operandi given the 1996 robbery's "sufficient distinct and standard commonalities" with Felix's charged conduct. For the reasons that briefly follow, we agree.

We have adopted a three-step test in reviewing a district court's admission of Rule 404(b) evidence. *See United States v. Mandoka*, 869 F.3d 448, 456–57 (6th Cir. 2017). First, "we review for clear error whether there is a sufficient factual basis for the occurrence of the 'bad act' that is being proffered as evidence (and challenged pursuant to 404(b))." *Id.* at 456 (citation omitted). No one disputes this step, for Felix admitted to (and was convicted of) committing the 1996 robbery.

Second, we examine whether the government proffered the evidence for an admissible purpose. *Id.* Although our review is de novo, *id.*, we find persuasive the district court's thorough reasoning that the 1996 robbery is admissible to show identity and modus operandi, and we adopt it as our own. In brief, the similarities among the three robberies—early Wednesday morning, use of a weapon to force his way into the vault, use of a facial covering, and binding of bank employees—"in combination, present an unusual and distinctive pattern constituting a 'signature'" sufficient for purposes of admission under Rule 404(b). *United States v. Mack*, 258 F.3d 548, 554 (6th Cir. 2001). And although some aspects of the 1996 robbery were distinct (namely, Felix wore different attire, used different binding methods, and had "inside" help), we never require "the crimes be identical in every detail" for admission under Rule 404(b). *United States v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006) (citation omitted).[1]

---

[1] The main difference between the 1996 robbery and the 2015 robberies was Felix's decision in 2015 to forgo the use of accomplices. But as the district court observed, that decision appears as a refinement of method rather than an abandonment of core technique, given that his arrest in 1996 was the direct result of his accomplices' cooperation with law enforcement.

Third and last, "we review for an abuse of discretion whether the probative value of the proffered evidence is substantially outweighed by any undue prejudice that will result from its admittance." *Mandoka*, 869 F.3d at 456–57 (citation omitted). The district court found this step to also be in the government's favor, focusing on its highly probative nature and the limited evidentiary alternatives available to the government to prove identity. And the district court gave an appropriate limiting instruction with respect to the 1996 robbery. *See United States v. Allen*, 619 F.3d 518, 525 (6th Cir. 2010). On this record, we cannot say the objected-to evidence was "substantially more prejudicial than probative," *United States v. Jackson*, 918 F.3d 467, 483 (6th Cir. 2019), and therefore find no error, let alone an abuse of discretion.

III.

Felix next takes issue with how an investigator obtained pretrial voice identifications from some of the bank employees (and the subsequent introduction of those identifications at trial).

Lieutenant Steven Mathews of the Harrison Police Department obtained a recording of a traffic stop involving Felix and then asked the witnesses in August 2015—two months after the June Cheviot robbery and six months following the February Cincinnatus robbery—whether they could positively identify the recorded voice. Before playing the recording for each witness (and while covering up the video screen), Lt. Mathews read each the following statement:

> You will be asked to listen to the audio portion of a DVD. You will not be shown the video. The fact that the audio is being played for you should not influence your judgment. You should not conclude or guess that the audio contains the voice of any person who committed a crime involving you. You are not obligated to identify anyone. It is just as important to free innocent persons from suspicion as to identify guilty parties. Please do not discuss the case with other witnesses, nor indicate in any way that you have identified someone.

Matthews did not play any other audio for the witnesses. The results varied. One witness told Mathews he "was a hundred percent positive" it was the robber's voice. Two others pegged it at

seventy-five percent, and one of these two "got teary-eyed as the audio was being played. She thought it was the person who robbed the bank," but equivocated because "it was so long ago." The three remaining witnesses could not make a positive identification.

Felix contends the district court clearly erred when it denied his motion to suppress these identifications. *See United States v. Beverly*, 369 F.3d 516, 538 (6th Cir. 2004). A defendant seeking to exclude identification testimony must show that that the process was "both suggestive and unnecessary" so as to give rise to a "substantial likelihood of misidentification." *Perry v. New Hampshire*, 565 U.S. 228, 238–39 (2012) (citation omitted). If a defendant makes that showing, a court must then consider the totality of the circumstances surrounding the identification to evaluate its reliability. *United States v. Sullivan*, 431 F.3d 976, 985 (6th Cir. 2005).

In denying Felix's motion to suppress, the district court found unpersuasive Felix's contention that the process's single-recording nature rendered it impermissibly suggestive. This is because, in the district court's view, the results speak for themselves—only one witness was certain Felix was the robber, and the remaining five either harbored doubts or could not identify Felix at all. The district court also concluded that Lt. Mathews "took appropriate steps to minimize suggestiveness" by giving them the admonition and not otherwise influencing or tainting the process. Finally, the court rejected Felix's argument that because it used audio from a traffic stop, the process suggested Felix "had prior contact with law enforcement for breaking the law" given the circumstances of the traffic stop—the conversation's tone was respectful (and at one point the officer noted his sympathy after hearing Felix was returning from a funeral) and Felix did not receive a citation from the stop. Upon review of the record and Felix's one-paragraph repetition of the arguments he advanced below without critique of the district court's well-reasoned analysis, we discern no clear error in this conclusion. And even though this conclusion means we need not

consider defendant's remaining arguments concerning the recording's alleged unnecessary nature or unreliability, *see, e.g.*, *United States v. Washington*, 714 F.3d 962, 968 (6th Cir. 2013), we agree with the government that both the district court did not clearly err in rejecting those arguments and the overwhelming evidence of Felix's guilt would render any such error harmless, *see, e.g.*, *United States v. Kilpatrick*, 798 F.3d 365, 378–79 (6th Cir. 2015).

IV.

The last issue on appeal is whether the district court erred in concluding neither the Speedy Trial Act nor the Sixth Amendment merited dismissal of Felix's indictment despite there being close to two-and-one-half years between his indictment in January 2017 and trial in July 2019.

A.

We now set forth in more detail the facts and procedural history about this timespan. A grand jury indicted defendant on his three charges on January 18, 2017. Following his initial appearance (February 6, 2017), arraignment and detention hearing (February 9, 2017), and a preliminary pretrial conference (February 10, 2017), Felix moved for, and was granted, two continuances to prepare for discovery and trial. In granting these requests, the district court determined that the time running from March 3, 2017 to June 16, 2017 was excluded for Speedy Trial Act purposes under 18 U.S.C. § 3161(h)(7)(A), (B)(iv). A total of twenty days elapsed on the Speedy Trial Act clock before those dates.

Enter June 16, 2017. This date is important for two reasons. First, defendant filed two separate motions to suppress, one regarding the pretrial voice identifications discussed above, and the other evidence gathered from his sister's house. Second, this is also when the government filed its notice and motion to admit Felix's prior conviction for bank robbery discussed above. Briefing on these motions concluded July 21, 2017.

The case did not advance further until November, when the district court set a January 19, 2018 evidentiary hearing regarding the evidence collected at the home of Felix's sister. Following that hearing, the parties submitted supplemental briefing (and defendant even requested and received briefing extensions) which was finally completed on March 13, 2018. In the meantime, the district court similarly held an evidentiary hearing on the pretrial voice identifications on March 1, 2018, and post-hearing briefs were complete (again with defendant requesting an extension) on March 16, 2018.

Nothing happened from that point until June 18, 2018, when the government filed a motion for a status conference "to allow the Court and the parties to discuss the speedy trial clock and set the matter for trial." Two weeks later and without a response from the district court, Felix moved on July 6, 2018 to dismiss the indictment under the Speedy Trial Act. The government responded by again requesting a status conference for the reasons stated above.

Still, the district court did not act on the government's request. So on January 30, 2019, Felix filed another motion to dismiss, this time under the Sixth Amendment. Briefing on that motion finished on February 26, 2019. On April 8, 2019, the district court set an April 15, 2019 hearing on the motions to dismiss. And on May 14, 2019, it set a May 28, 2019 hearing on the government's 404(b) motion. The district court then resolved the pending motions by June 24, 2019. Following other motions and findings not relevant to this appeal, Felix's trial began July 1, 2019.

## B.

We turn first to whether the district court erred in denying Felix's motion to dismiss under the Speedy Trial Act. The Act provides that a trial "shall commence within seventy days" after the public filing of an indictment or initial appearance (whichever comes later), 18 U.S.C.

§ 3161(c)(1), but includes a number of exclusions from this seventy-day period. The district court concluded that the government's June 16, 2017 in limine motion to admit evidence of the prior bank robbery under Federal Rule of Evidence 404(b) tolled the clock at twenty days under § 3161(g)(D), and thus denied defendant's motion.[2] Upon review of the district court's factual findings for clear error and its interpretation of the Act de novo, *see United States v. Stewart*, 729 F.3d 517, 523 (6th Cir. 2013), we agree.

Section 3161(h)(1)(D) provides that any "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" is automatically excluded from consideration. The Supreme Court has interpreted this language to mean that "when a pretrial motion requires a hearing, [it] on its face excludes the entire period between the filing of the motion and the conclusion of the hearing." *Henderson v. United States*, 476 U.S. 321, 329 (1986). Upon completion of the hearing (as well as receipt of supplemental filings related to the heard motion), the Act then requires "prompt disposition" of the motion that is now considered "actually under advisement." *Id.* at 329, 331. But even then, § 3161(h)(1)(H) excludes up to thirty days from that date. *See also United States v. Mentz*, 840 F.2d 315, 326–27 (6th Cir. 1988) (discussing interplay between (h)(1)(D) and (h)(1)(H), as well as those motions not requiring a hearing). Finally, "the filing of a pretrial motion falls within [§ 3161(h)(1)(D)'s exclusion] irrespective of whether it actually causes, or is expected to cause, delay in starting a trial." *United States v. Tinklenberg*, 563 U.S. 647, 650 (2011).

There is no disputing that the government's June 16, 2017 Rule 404(b) motion tolled the Speedy Trial Act clock. Defendant contends it was at most a motion falling under

---

[2]It also held in the alternative that the government's June 18, 2018 motion tolled the clock at fifty-two days. We need not address this holding.

§ 3161(h)(1)(H)'s thirty-day, "actually under advisement" provision. This is because, he argues, neither party requested a hearing, and the court did not state it was going to hold a hearing upon briefing completion. We disagree.

Section § 3161(h)(1)(D)'s plain language, as interpreted by the Supreme Court in *Henderson*, belies this argument. Here the district court concluded the government's motion "require[d] a hearing," *Henderson*, 476 U.S. at 329, and held one on May 28, 2019. That the district court did not contemporaneously indicate its intent to hold a hearing following the completion of briefing is of no moment—the scheduling and completion of the hearing is all that is required to for § 3161(g)(1)(D) to apply. *Id.* And we refuse to conclude, as defendant implies, that the district court held the hearing in retrospect to cure a Speedy Trial Act issue. We take the district court at its word that it "always schedules motions *in limine* for hearing and fully intended to do so in this case." And following the hearing, it resolved the motion within thirty days (and thus § 3161(h)(1)(H)'s exclusion applied to *that* delay), entering an order granting the government's motion on June 24, 2019. By this point and as set forth above, only twenty days had run. With Felix's trial beginning on July 1, 2019, the district court properly concluded Felix did not establish a violation of the Speedy Trial Act.

C.

That leaves us with Felix's related Sixth Amendment claim. The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. Const. amend. VI. In *Barker v. Wingo*, the Supreme Court established four factors for evaluating a speedy-trial claim under the Sixth Amendment: (1) whether the delay was uncommonly long; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether prejudice to the defendant resulted. 407 U.S. 514, 530 (1972). "No

one factor is dispositive. Rather, they are related factors that must be considered together with any other relevant circumstances." *United States v. Sutton*, 862 F.3d 547, 559 (6th Cir. 2017). In determining whether a defendant's Sixth Amendment right to a speedy trial has been violated, we review questions of law de novo and questions of fact for clear error. *United States v. Young*, 657 F.3d 408, 413–14 (6th Cir. 2011). We agree with the district court that even assuming the trial delay was presumptively prejudicial under the first factor, none of the other factors render a finding that the delay violated Felix's Sixth Amendment right to a speedy trial.

"The second *Barker* factor looks at whether the government or the criminal defendant is more to blame for the delay." *United States v. Zabawa*, 719 F.3d 555, 563 (6th Cir. 2013) (internal quotation marks and brackets omitted). "Governmental delays motivated by bad faith, harassment, or attempts to seek a tactical advantage weigh heavily against the government, while neutral reasons such as negligence are weighted less heavily, and valid reasons for a delay weigh in favor of the government." *United States v. Robinson*, 455 F.3d 602, 607 (6th Cir. 2006). Thus, "different weights should be assigned to different reasons[,]" *Barker*, 407 U.S. at 531, and a district court's conclusions regarding these inquiries are entitled to "considerable deference." *United States v. Brown*, 169 F.3d 344, 349 (6th Cir. 1999) (citing *Doggett v. United States*, 505 U.S. 647, 652 (1992)). In finding this factor to be neutral at best, the district court found significant delay attributable to defendant (due to his requests for additional time and his own pretrial motions) and just a "small fraction" attributable to the government. Felix acknowledges his actions contributed to the delay (and finds no fault with the government's conduct here) but contends the district court unnecessarily delayed resolving what he characterizes as uncomplicated pretrial motions. The district court viewed the motions, and their resolution, differently, noting its difficulty in working through the evidence submitted and its decision to defer the resolution of the suppression motions

pending resolution of defendant's speedy-trial motions. On this record, we see no reason to upset the district court's weighing of this factor.

The third *Barker* factor considers "[w]hether and how a defendant asserts his right" to a speedy trial, and "is closely related to the other factors." 407 U.S. at 531. That is, "[t]he strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences." *Id.* As the district court concluded, this factor is again neutral. On the one hand, Felix asserted his Sixth Amendment rights below, but on the other, he did so two years after indictment and after seeking several continuances and extensions of time.

The fourth and final *Barker* factor "requires the defendant to show that substantial prejudice has resulted from the delay." *Zabawa*, 719 F.3d at 563 (citation omitted). We assess prejudice "in the light of the interests of defendants which the speedy trial right was designed to protect . . . : (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. The last is "most serious . . . because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* The only prejudice advanced by Felix here is his pretrial incarceration. But "when the government prosecutes a case with reasonable diligence"—as is the case here—"a defendant who cannot demonstrate how his defense was prejudiced with *specificity* will not make out a speedy trial claim no matter how great the ensuing delay." *Young*, 657 F.3d at 418 (brackets and citation omitted). Because the government prosecuted Felix with reasonable diligence and justified the reasons for his delayed trial, Felix has not demonstrated either a presumption of prejudice or oppressive pretrial incarceration sufficient to weigh this factor in his favor. *United States v. Williams*, 753 F.3d 626, 634 (6th Cir. 2014).

In sum, we agree with the district court that upon consideration of the *Barker* factors and the totality of the circumstances, Felix sustained no speedy trial deprivation in violation of the Sixth Amendment.

V.

For these reasons, we affirm the district court's judgment.