NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0077n.06

No. 09-2286

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jan 23, 2012*

LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,

  Plaintiff-Appellee,

    v.

MYRON L. HOOKER,

  Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE: MARTIN and GRIFFIN, Circuit Judges; ANDERSON, District Judge.[*]

GRIFFIN, Circuit Judge.

Myron L. Hooker appeals his sentence imposed after pleading guilty to one count of conspiracy to commit fraud and one count of wire fraud. We affirm.

I.

In October 2005, Myron Hooker, along with five co-defendants,[1] was charged in a twenty-count indictment alleging conspiracy, mail fraud, and wire fraud. Hooker owned or worked with various companies in southwestern Michigan that he used to process fraudulent mortgage loan applications.

---

[*]The Honorable S. Thomas Anderson, United States District Judge for the Western District of Tennessee, sitting by designation.

[1]The co-defendants were Peter Garland, Nicole Jackson, Antwan McRae, Keith Lakey, and Monique Bankhead.

The mortgage fraud scheme operated in the following way. Hooker or co-defendant Garland persuaded "straw buyers" – persons with decent credit who wish to invest in real estate – to purchase distressed properties in their names. Telling the buyers they were "investors" in the properties, Hooker helped to purchase the properties by providing the down payment. He promised the buyers he would lease and maintain the properties on their behalf. The buyers thought they would make money through the collection of rent and upon the eventual sale of the properties at a profit.

After Hooker identified a property and buyer, he routed the buyer to a loan officer, whom Hooker had supplied with false information regarding the buyer's income, assets, intention to occupy the property, and source of the down payment. The loan officers used the false information and a fraudulently inflated appraisal for the property to obtain financing in excess of the amount required to purchase the property. Hooker collected the excess financing under the guise of payment toward a false construction lien he or Garland had fraudulently placed on the property in their company names. He then split the excess with his co-conspirators and the straw buyer[2] in varying amounts. Sometimes Hooker initially provided the buyer with monthly mortgage payments in order to conceal the fraud, but stopped after a few months, at which time the buyer, unable to make payments himself, would default on the loan. The bank would foreclose the buyer's rights and sell the property at auction for less than the amount of the loan.

The government charged Hooker and his co-conspirators in a single indictment with mail and wire fraud, as well as conspiracy to commit fraud. Hooker represented himself for three years before

---

[2]The straw buyers were not charged in the Indictment.

retaining counsel. During this time, he filed many frivolous pleadings related to alleged jurisdictional defects in the proceedings, refused to engage in the discovery process, and violated the terms of his bond. He also filed a fraudulent financing statement with the Michigan Department of State Uniform Commercial Code Section naming as debtors the district judge, the Assistant United States Attorney prosecuting him, and two magistrate judges involved in his proceedings. The Michigan Department of State promptly terminated the statement after the district judge notified the Department that the statement was false.

Hooker retained counsel and eventually pled guilty to counts one and eleven of the indictment (conspiracy and wire fraud, 18 U.S.C. §§ 371 and 1343, respectively). A presentence report was prepared. Hooker objected to a sixteen-level increase on account of the loss amount, U.S.S.G. § 2B1.1(b)(1),[3] a three-level increase due to Hooker's role in the criminal activity, U.S.S.G. § 3B1.1(b), and the inclusion of a two-level (instead of a three-level) reduction for acceptance of responsibility.

The district court conducted a sentencing hearing at which FBI Special Agent John Ryan and co-defendants Monique Bankhead, Keith Lakey, Antwan McRae, and Peter Garland testified regarding the factual basis for the enhancements for loss and Hooker's role in the offense. After hearing the testimony, the district court overruled Hooker's objections.

The district court calculated Hooker's range under the United States Sentencing Guidelines as follows: it began with a base offense level of seven, U.S.S.G. §§ 2B1.1(a)(1), 2X1.1(c)(1); added

---

[3]Citations herein to the Sentencing Guidelines are to the 2008 version used at sentencing.

sixteen levels under U.S.S.G. § 2B1.1(b)(1)(I) on account of the loss amount ($1,206,310); and

added three more levels under U.S.S.G. § 3B1.1(b) after finding Hooker was a manager or supervisor

of criminal activity that included five or more participants. The court did not award a reduction for

acceptance of responsibility. With a criminal history category of I and an adjusted offense level of

26, Hooker's advisory range was 63-78 months. The district court sentenced Hooker to concurrent

prison sentences of 40 months on count one and 63 months on count eleven. It ordered restitution

in the amount of $1,206,310. Hooker timely appealed.

## II.

Hooker challenges his sentence in three ways. He argues first that the district court failed

to comply with Rule 32 of the Federal Rules of Criminal Procedure before imposing the sentence.

He next challenges the procedural and substantive reasonableness of his prison sentence. Finally,

he challenges the district court's award of restitution. We address each challenge in turn.

## III.

Hooker first contends that the district court failed to comply with Criminal Rule 32, which

requires the district court to either rule on "any disputed portion of the presentence report or other

controverted matter" or determine that a ruling is unnecessary because it will not affect sentencing.

Fed. R. Crim. P. 32(i)(3)(B). The rule prohibits courts from "merely summarily adopt[ing] the

factual findings in the presentence report or simply declar[ing] that the facts are supported by a

preponderance of the evidence." *United States v. White*, 492 F.3d 380, 415 (6th Cir. 2007) (citations

and internal quotation marks omitted). It codifies the principle that courts "must *actually find facts*, and [they] must do so by a preponderance of the evidence." *Id.* at 416.

Hooker received a substantial enhancement based on the loss amount attributed to his conduct. In his view, the district court, without recognizing his objection, summarily adopted the loss calculation in the presentence report and failed to articulate its methodology. He did not raise the alleged Rule 32 violation in the district court, so we review for plain error. *United States v. Vonner*, 516 F.3d 382, 388 (6th Cir. 2008) (en banc).

Hooker presently objects to the loss calculation on grounds he did not raise in the proceedings below. We cannot fault the district court for not ruling on objections never raised before it. Accordingly, so long as the district court ruled on the objections actually before it, there is no Rule 32 problem. *See White*, 492 F.3d at 415 ("As a threshold matter, the defendant must actively raise the dispute during the sentencing hearing before the district court's duty to find facts arises.").

Hooker's sole objection in the district court to the government's loss calculation was that it included loss on properties in which he believed the government could not prove he had any involvement. He contended that the loss amount instead was $150,000 because, in his view, that was the only amount that could be tied to him through closing documents bearing his name. After hearing an entire morning of testimony amply supporting a finding of Hooker's involvement in the properties included in the calculation, the district court overruled Hooker's objection. The district court did not summarily adopt the factual findings in the presentence report regarding loss. Indeed,

it acknowledged before receiving testimony that making findings based solely upon statements in the government's sentencing memorandum would be improper.

Hooker focuses entirely on one statement by the district court in an attempt to prove an improper summary adoption of the presentence report's loss calculation: "I, in assessing the objections that were raised, believe that they are without merit and thus I will overrule the objections that have been lodged." Were that statement the entire discussion of Hooker's objection to loss, his claim of error might have some merit. But there was more. Hooker's narrow focus unfairly ignores the district court's statements immediately following its ruling:

> I have listened to the arguments with regard to the objections and I have listened to the testimony of Mr. Hooker's codefendants, Ms. Bankhead, Mr. Lakey, Mr. McRae, and Mr. Garland. Although many of them, perhaps all of them, may have acknowledged that the documents [that] were furnished to them did not contain Mr. Hooker's signature, it is apparent to this Court, based upon the totality of the evidence that was presented, that Mr. Hooker's, quote, fingerprints, end of quote, [are] all over these documents. There is no question in my mind that Mr. Hooker was the leading force in the fraud that brings him, as well as the other defendants, into this courtroom.

These statements sufficiently set forth the district court's sound basis for calculating loss in response to Hooker's sole objection – i.e., the court's view that a lack of Hooker's signature on closing documents did not mean he was not sufficiently involved in the fraud on all ten properties included in the calculation. *See also* R. 260 at 189 (COURT: "Is it your view that fraud cannot occur without a written signature on a real estate transaction?"). Hooker's narrow focus also ignores the fact that the court heard almost an entire day's worth of testimony supporting the government's loss calculation before ruling. The district court met its obligation under Rule 32.

IV.

Hooker next challenges the reasonableness of his prison sentence. We "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence . . . ." *Gall v. United States*, 552 U.S. 38, 51 (2007). "If the sentence is 'procedurally sound,' we 'then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard.'" *United States v. Wettstain*, 618 F.3d 577, 591 (6th Cir. 2010) (quoting *Gall*, 552 U.S. at 51).

A.

Hooker contends that his sentence is procedurally unreasonable because the district court: (1) incorrectly calculated loss under the Guidelines; (2) declined to apply a reduction for acceptance of responsibility; (3) increased the offense level based on Hooker's status as a manager or supervisor; (4) treated the Guidelines as mandatory; and (5) failed to address the relevant § 3553(a) factors and make an individualized assessment of the facts. We address each claim separately.

1. Loss Calculation

Hooker received a sixteen-level increase because the loss associated with his conduct ($1,206,310) was between $1 million and $2.5 million. U.S.S.G. § 2B1.1(b)(1)(I). To calculate loss, the district court subtracted the value of each of ten properties, as determined by its sale price at foreclosure, from the total amount of financing obtained to purchase the property. Special Agent

Ryan testified that, based upon his interviews with witnesses and his review of recorded phone conversations between Hooker and his co-conspirators, Hooker was involved in each of the ten properties included in the calculation. The district court credited the testimony.

Hooker never objected to this method of calculating loss; he argued only that the calculation should not include all ten properties because he did not sign documents for those properties. The district court found otherwise, however, and its finding is not clearly erroneous. Hooker now contends that this method was flawed in various ways. While we usually give fresh review to the district court's methodology for calculating loss and review its underlying factual findings for clear error, *White*, 492 F.3d at 414, we review Hooker's new claims only for plain error because he did not raise them below.

Hooker argues first, without any evidence, that the lending institutions he defrauded probably sold the loans to investors who later bundled the loans into mortgage-backed securities. Because the record does not indicate how much the loans were sold for, Hooker maintains, it is impossible to determine the amount of loss (if any) to the original lending institutions. Hooker is speculating about a major premise of his argument – that the lenders sold the loans and thereby suffered little or no loss from the fraud. And although he says the district court should have taken judicial notice of this fact, he never asked it to take judicial notice, and a court *must* take judicial notice only when a party requests it and supplies the court with the necessary information. Fed. R. Evid. 201(c)(2). More to the point, judicial notice is inappropriate here, where the fact Hooker wishes the district court would have judicially noticed no doubt is subject to reasonable dispute. *See* Fed. R. Evid. 201(b).

Hooker also argues that the district court's methodology failed to consider payments made on the loans prior to default and the effect of mortgage insurance. The Indictment does allege that Hooker sometimes paid the initial mortgage payments to cover up the fraud, and it appears these amounts were not included in the loss calculation. However, Hooker offered no evidence of the amount he repaid on any loan. And absent any identifiable repayment amounts, even had Hooker requested consideration of these payments in calculating loss, the district court would have had no idea by how much to reduce the loss amount. Therefore, the district court did not plainly err by not reducing the loss amount by any amount Hooker repaid. *Cf. United States v. Gale*, 468 F.3d 929, 942 (6th Cir. 2006) (upholding amount of restitution award in the face of the defendant's challenge to the loss amount based on alleged payments to the victim where the defendant failed to produce reliable evidence of the payments).

But even were there any error in this regard, it did not affect Hooker's substantial rights – indeed, it was *harmless*. *See* Fed. R. Crim. P. 52(a); *United States v. Johnson*, 467 F.3d 559, 564 (6th Cir. 2006) (noting that an error at sentencing is harmless where it did not cause the defendant to receive a more severe sentence). That is because the loss amount of $1,206,310 was considerably more than the $1 million threshold required for the sixteen-level enhancement. And only speculation could support the contention that the few payments Hooker did make reduced the loss by more than

$206,310, placing Hooker in a lower loss range and, consequently, a lower Guidelines range. Were the payments substantial, Hooker undoubtedly would have raised the issue at sentencing.[4]

Hooker also claims that the total loss amount must be reduced by the amount the lenders had recovered by the time of sentencing. True enough, *see* U.S.S.G. § 2B1.1, cmt. n.3(E), but the district court's loss calculation already accounted for the amounts lenders recovered, by subtracting the fair market value of the property from the total loan amount. Hooker offered no evidence that the lenders recovered any additional amounts from the straw buyers.

Finally, Hooker contends that because the amount of loss was speculative and unreliable, the district court should have used gain as an alternative method for determining loss. *See* U.S.S.G. § 2B1.1, cmt. n.3(B) ("The court shall use the gain that resulted from the offense as an alternative measure of loss *only if there is a loss but it reasonably cannot be determined*." (emphasis added)). Hooker never asked the district court to consider gain or provided any indication (or evidence) of the amount he gained from the scheme. Moreover, determining loss by considering gain would be inappropriate here because loss reasonably can be determined.

## 2. Acceptance of Responsibility

Hooker contends that the district court erred by denying a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a). Pleading guilty before trial, combined with "truthfully

---

[4]As for the effect of mortgage insurance on the loss amount, Hooker is again speculating. He has offered no evidence of the presence or effect of mortgage insurance on loss incurred by the lending institutions. Nor is it clear in what way, if any, insurance would affect the loss calculation. *See generally* U.S.S.G. § 2B1.1, cmt. n.3 (instructing in detail how to calculate loss and mentioning nothing about deductions for insurance payments to the victim).

admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct," is significant in establishing an entitlement to the reduction but may be outweighed "by conduct . . . that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1, cmt. n.3. Where the facts are not in dispute, we give deference and review the district court's decision for clear error. *United States v. Johnson*, 627 F.3d 578, 585 (6th Cir. 2010).

During allocution, Hooker stated, "I – also, Your Honor, I take full responsibility for my actions, full responsibility." He contends that this statement, along with the fact that he did not make the government try the case, entitles him to the reduction. The district court denied a reduction in a lengthy discussion that highlighted Hooker's continued disregard for the law throughout the proceedings, demonstrated by his violation of the terms of his bond; his refusal to engage in the discovery process or consult with his court-appointed counsel; his obstreperous and inappropriate conduct during pretrial proceedings; and his filing of a false financing statement naming the prosecutor, two magistrates, and the district judge, as debtors, which conduct by itself, the court believed, constituted a federal offense. Hooker does not dispute the factual accuracy of any of these reasons or challenge the propriety of considering them. Rather, he argues that the district court failed to credit the significance of the guilty plea itself. But a defendant who pleads guilty is not entitled to the reduction "as a matter of right." U.S.S.G. § 3E1.1, cmt. n.3. The district court determined that Hooker's conduct during the proceedings belied his expressed acceptance of responsibility, and it did not clearly err in doing so.

### 3. Role Enhancement

The district court increased Hooker's offense level by three levels after finding that he was the "leading force" in the mortgage fraud conspiracy. The Guidelines provide for a three-level increase if the defendant "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). The "key issue" in applying the enhancement "is not direct control or ultimate decision-making authority, but rather the defendant's 'relative responsibility.'" *United States v. Henley*, 360 F.3d 509, 517 (6th Cir. 2004) (quoting *United States v. Gaitan-Acevedo*, 148 F.3d 577, 595-96 (6th Cir. 1998)).

The Supreme Court's decision in *Buford v. United States*, 532 U.S. 59 (2001), may call into doubt some of our earlier statements regarding the level of deference we give to a district court's application of the role enhancement. *See United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009); *United States v. Moncivais*, 492 F.3d 652, 660 (6th Cir. 2007). We need not resolve the issue here, however, because our determination does not depend on how much deference we afford the district court.

The facts here support the district court's application of the three-level enhancement. Hooker was responsible for finding and securing the cooperation of many of the straw buyers, supplying them with down payments, providing the loan officers with false information for the applications, and making sure the deals closed smoothly. For instance, Hooker recruited Tracy Darnell as a straw buyer for four properties, connected her to co-defendant Monique Bankhead (a loan officer) to

complete the loan applications, and was responsible for telling Bankhead which information to include in the applications. Also, co-defendant Antwan McRae testified that, while he was working with co-defendant Garland to process a loan application, Garland had to "run everything past Mr. Hooker," showing that Hooker had a higher level of responsibility in the scheme than even his partner. Furthermore, co-defendant Keith Lakey testified that Hooker provided him with the straw buyer's necessary financial information and a power of attorney that permitted Lakey to deal directly with Hooker instead of the buyer. The buyer refused to sign anything at closing until Hooker told him to sign. Moreover, Garland testified that he was Hooker's "business partner" and that they agreed to split the proceeds from the criminal activity 51/49, with Hooker receiving the larger share. Finally, Special Agent Ryan testified that he listened to phone conversations between Garland and Hooker. According to Ryan, Hooker and Garland spoke everyday regarding "business, real estate, finding houses, finding investors, making money, [and] getting a bunch of money off loans." Ryan's impression after listening to the phone conversations was that Hooker "was involved in all aspects of [each property]." This testimony adequately supports the district court's determination that Hooker qualified for the role enhancement. *Cf. United States v. Stafford*, 639 F.3d 270, 276 (6th Cir. 2011).

## 4. Treatment of the Guidelines

Hooker contends that the district court improperly treated the Guidelines as mandatory. "[T]he district court cannot presume that the sentencing range recommended under the Guidelines is mandatory or even reasonable." *United States v. Herrera-Zuniga*, 571 F.3d 568, 582 (6th Cir.

2009).  We presume that the district court knows and applies the law during sentencing, *Gale*, 468

F.3d at 941, which means we presume that the court understood the advisory nature of the

Guidelines.  *See United States v. Garthus*, 652 F.3d 715, 721 (7th  Cir. 2011) ("We don't read [the

district court's] remark about the guidelines' being 'reasonable' to mean that he was giving them

presumptive force, which would be improper.  He is presumed to know the law (a realistic

presumption, given how large sentencing looms in the work of district judges nowadays)." (internal

citation omitted)).  To rebut this presumption, the defendant must "'marshal evidence'" that the

district court treated the Guidelines as mandatory.  *United States v. McCaster*, No. 09-4356, 2011

WL 3664206, at *5 (6th Cir. Aug. 22, 2011) (per curiam) (quoting *United States v. Bailey*, 488 F.3d

363, 367 (6th Cir. 2007)).  Hooker did not raise the issue before the district court, so we review for

plain error.  *United States v. Barnett*, 398 F.3d 516, 525 (6th Cir. 2005).

> The entirety of Hooker's argument on this issue reads as follows:
>
> There is no evidence in this case that the district court recognized that it had discretion to sentence outside [the] guidelines.  This lack of evidence, combined with the district court's failure to articulate its reasons for arriving at the offense level significantly increased defendant's sentence and thereby affected his substantial rights.

Nothing in the record shows that the district court treated the Guidelines as mandatory.

Hooker has not rebutted the presumption that the district court properly considered the Guidelines.

### 5.  Addressing the § 3553(a) Factors and Explaining the Sentence

Finally, Hooker contends that the district court addressed the § 3553(a) factors only in

passing and failed to make an "individualized assessment" of defendant based on the facts presented.

Although the district court did not expressly identify and apply each § 3553(a) factor individually, the record reflects that the district court considered the evidence and Hooker's arguments before imposing its sentence. That is sufficient. *See United States v. Denny*, 653 F.3d 415, 423-24 (6th Cir. 2011) ("[T]his court has emphasized that a district court 'need not recite' the § 3553 factors when it imposes a sentence. The crucial question is whether the record makes clear that the sentencing judge listened to each argument, considered the supporting evidence, was fully aware of the defendant's circumstances and took them into account in sentencing him." (internal citation, quotation marks, and alterations omitted)).

B.

In his sole challenge to the substantive reasonableness of his sentence, Hooker contends that the district court created an "unconscionable" disparity between his sentence and the anticipated sentence of co-defendant Peter Garland, the Guidelines range for whom the parties calculated at 30-37 months, or roughly half of Hooker's range.

Sentencing courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). This factor is concerned with *national* disparities, not differences in sentences between co-defendants. *United States v. Simmons*, 501 F.3d 620, 623 (6th Cir. 2007). "A district judge, however, *may* exercise his or her discretion and determine a defendant's sentence in light of a co-defendant's sentence." *Id.* at 624 (emphasis in original). The decision rests within the judge's

discretion, and, unless the district court did not understand its discretion, the decision is not reviewable. *Id.*

Here, the district court asked counsel for the government to address any differences in conduct between Hooker and Garland and whether any differences warranted giving Hooker a sentence within Garland's range. Counsel argued that Hooker was more involved in the scheme, had bullied at least one seller during closing, and "was willing to go the extra mile" to get these deals closed. The district court considered these statements, along with the testimony, and found that "a legitimate and good case can be made for separating Mr. Hooker from the other defendants, including that of Peter Garland." Nothing in the record shows that the district court lacked an understanding that it could vary below the Guidelines range.

V.

Hooker contends that the district court abused its discretion in ordering restitution because the order was not based on sufficient evidence establishing the existence of identifiable victims or the loss amount. Because Hooker did not raise these challenges below, we review for plain error. *United States v. Freeman*, 640 F.3d 180, 186 (6th Cir. 2011).

The district court ordered restitution in the amount of $1,206,310. Because Hooker committed an offense by "fraud or deceit," and because an "identifiable victim or victims ha[d] suffered a . . . pecuniary loss," restitution was mandatory. 18 U.S.C. § 3663A(c). A "victim" is one who is "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered . . . ." 18 U.S.C. § 3663A(a)(2). The victims here were the lenders from

whom Hooker obtained the mortgage loans. The court calculated the restitution amount in the same way it calculated loss for purposes of the sentencing enhancement.

Hooker contends only that there are no identifiable victims or harm because the lenders "had long since sent the loans downstream and their losses, if any[,] are incapable of reasonable determination." As with his related Guidelines argument, this argument is based entirely on speculation. Without evidence that the lending institutions sold the loans at little to no loss, there was no basis for the district court to refuse to order restitution in the amount proposed in the presentence report and verified by Special Agent Ryan's testimony.

VI.

We affirm.