NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0965n.06

No. 11-3625

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Aug 31, 2012*

LEONARD GREEN, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) |
| | ) |
| GREGORY S. CHEW, | ) |
| | ) |
| Defendant-Appellant. | ) |
| | ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

O P I N I O N

BEFORE:  NORRIS, McKEAGUE and KETHLEDGE, Circuit Judges.

**McKEAGUE, Circuit Judge.**  Defendant was convicted after a two-week jury trial of various fraud-related offenses for his participation as a "facilitator" in a scheme to obtain money by fraudulent pretenses from mortgage lenders during a five-year period.  He was sentenced to sixty months' imprisonment.  On appeal, defendant challenges his conviction on two grounds, contending his speedy trial rights were violated and the verdict is not supported by sufficient evidence.  He also contends his sentence is procedurally unreasonable in three respects.  For the reasons that follow we affirm the judgment of the district court.

## I.  BACKGROUND

Defendant Gregory S. Chew describes himself as "a rehabber of older typically dilapidated homes."  His *modus operandi* in the Dayton area during the relevant period included: (1) identifying a suitable property; (2) approaching the owner with the idea of selling; (3) reaching a sale price

agreement with the owner; (4) hiring contractors to make improvements to the property; (5) finding and referring a prospective purchaser (with mortgage broker) to the owner; (6) "fronting" the required down payment money to the purchaser prior to closing; and (7) upon closing the sale, receiving payment from the seller, consisting of the remainder of the ultimate purchase price (after the seller was paid the agreed-to price and contractors were paid for their services).   In connection with each of the five transactions principally at issue in this case, Chew worked with a mortgage broker, co-defendant Richard Confer.  Confer was responsible for preparing the loan applications for the prospective purchasers referred by Chew.  On each of the subject loan applications, signed by Confer, the borrower was identified as the source of the down payment on the purchase price. Confer knew, however, that Chew had actually provided the funds with which each purchaser made the down payment.  Confer did not disclose this fact to the lenders.

It was this practice essentially—Chew's surreptitious gifting of down payment monies to purchasers to enhance their credit-worthiness and facilitate approval of their loan applications (and Confer's failure to disclose this fact to lenders)—that became the focus of a federal criminal investigation and prosecution in the Southern District of Ohio.  In the first superseding indictment, filed July 15, 2009, defendant Chew was charged in relevant part with one count of money laundering, twenty-four counts of unlawfully structuring financial transactions, one count of conspiracy to launder money, five counts of mail fraud, and three counts of wire fraud.  Confer was also charged as a co-defendant under the conspiracy, mail fraud and wire fraud counts.  In addition, Chew's wife, Peggy Pierson, was charged under the conspiracy and wire fraud counts.  Shortly before trial began in February 2010, the court dismissed, on the government's motion, one of the

financial structuring counts and two of the mail fraud counts against Chew. Also on the eve of trial, Confer entered into a plea agreement, pleading guilty to one count of conspiracy to launder money. Confer agreed to cooperate with the government in exchange for dismissal of all other charges against him and the government's agreement to recommend that no term of incarceration be imposed as part of the sentence.

After the jury was selected on February 22, 2010, two weeks of trial ensued, with Confer playing the lead witness role for the prosecution. On March 5, at the close of the proofs, defendants having called no witnesses, the court granted defendant Pierson's Rule 29 motion for judgment of acquittal as to two of the wire fraud charges against her, but denied Chew's Rule 29 motion in its entirety. The jury began deliberations on March 9 and returned its verdict on March 15. The jury found Pierson not guilty on the remaining two counts against her, and found Chew not guilty of the financial structuring charges. However, the jury found Chew guilty of money laundering, conspiracy to launder money, and three counts each of mail fraud and wire fraud.

After defendant Chew's renewed Rule 29 motion for judgment of acquittal was denied, the district court conducted an evidentiary hearing on February 4, 2011 to determine the loss attributable to Chew's conduct. On May 23, 2011, sentence was imposed. The court determined the loss to be $1 million and sentenced Chew to sixty months' imprisonment on each of the eight convicted counts, to be served concurrently. Chew raises five issues on appeal.

## II. ANALYSIS

### A. Speedy Trial Rights

Chew contends that pretrial delays in this case violated both his constitutional and statutory speedy trial rights. He contends the district court erred when it denied his pretrial motion to dismiss the indictment on speedy trial grounds. In connection with both challenges, we review rulings of law de novo and findings of fact for clear error. *See United States v. Young*, 657 F.3d 408, 413-14 (6th Cir. 2011) (Sixth Amendment); *United States v. Sobh*, 571 F.3d 600, 602 (6th Cir. 2009) (Speedy Trial Act).

### 1. *Constitutional Right*

The standard governing Chew's constitutional challenge was recently summarized in *Young* as follows:

> The Supreme Court has specified four factors for evaluating a Sixth Amendment speedy-trial claim: (1) length of delay, (2) the reason for the delay, (3) the defendant's assertions of his right, and (4) prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). None of the factors is "a necessary or a sufficient condition to the finding of a deprivation of the right of speedy trial," but the factors are related and "must be considered with such other circumstances as may be relevant" in "a difficult and sensitive balancing process." *Id.* at 533.

> \* \* \* \*

> The first *Barker* factor—the length of the delay—serves as a threshold or "triggering mechanism" for a speedy-trial analysis. *Id.* at 530. The length is measured from the earlier of the date of arrest or the date of indictment. *United States v. Bass*, 460 F.3d 830, 836 (6th Cir. 2006) (citing *Maples v. Stegall*, 427 F.3d 1020, 1026 (6th Cir. 2005)).

> \* \* \* \*

A court need only consider the other *Barker* factors if there has been "uncommonly long" delay. *Id.* This court has held that a delay of more than one year is presumptively prejudicial and triggers application of the remaining three factors. *Id.*

657 F.3d at 414.

Here, the period of delay after indictment, on April 28, 2009, until trial commenced on February 22, 2010, was less than ten months. This hardly seems "uncommonly long," but there is authority for the proposition that a delay of as little as eight months may be considered "presumptively prejudicial," triggering consideration of the other *Barker* factors. *See United States v. Brown*, 498 F.3d 523, 530 (6th Cir. 2007). Most of the delay in this case occurred after the return of the first superseding indictment, in July 2009, which added new charges against Chew and two new defendants, Confer and Pierson. Both of the newly added defendants moved for and were granted, without objection by Chew, an ends-of-justice continuance of the trial until February 2010. Chew did not complain about the delay and did not assert his speedy trial rights until he filed his motion to dismiss on the eve of trial. Delay occasioned by the ends-of-justice continuance cannot be blamed on the government. To the extent the delay occasioned by the ends-of-justice continuance was indirectly caused by the filing of the superseding indictment, Chew's speedy trial claim would be strengthened only if the record showed abuse of prosecutorial discretion, such as dilatory purpose or bad faith. Chew has not made this showing. He has not shown that the superseding indictment was groundless or that it was filed to gain some impermissible tactical advantage. Nor has he shown the sort of "substantial prejudice" that would warrant relief for a Sixth Amendment speedy trial violation.

Accordingly, balancing the *Barker* factors, we conclude that the district court did not err in rejecting Chew's Sixth Amendment challenge to the pretrial delay.

## 2. *Speedy Trial Act*

Under the Speedy Trial Act, 18 U.S.C. § 3161, Chew was entitled to be brought to trial within seventy days after the date of the indictment or arraignment, whichever is later, subject to certain enumerated delay exclusions. *Sobh*, 571 F.3d at 602. Chew acknowledges that the filing of the superseding indictment naming new defendants would ordinarily be deemed to restart the speedy trial clock, 18 U.S.C. § 3161(h)(7), and that his speedy trial clock would ordinarily have been extended by the ends-of-justice continuance granted to his co-defendants. *United States v. Blackmon*, 874 F.2d 378, 380 (6th Cir. 1989). He contends that courts have recognized exceptions, however, where the delay occasioned by a superseding indictment is shown to be unreasonable, the product of bad faith, or a pretext to avoid the requirements of the Speedy Trial Act.

The problem for Chew is that the cases he relies on in support of a such an exception are readily distinguishable and he has not even made a prima facie case that the government acted unreasonably or in bad faith in its prosecution of the case. Chew has not made out a violation of his rights under the Speedy Trial Act.

We therefore affirm the district court's denial of Chew's pretrial motion to dismiss. Chew has failed to show that the ten-month delay between the filing of the original indictment and commencement of trial was uncommonly long, was caused by the government for improper purposes, or resulted in substantial prejudice.

**B. Sufficiency of the Evidence**

Defendant Chew contends the district court erred when it denied his Rule 29 motions for judgment of acquittal. He insists the government's proofs lacked evidence that he knew it was unlawful for him to fail to disclose to the lending institutions that he provided down payment monies to borrowers and that he specifically intended to defraud the lenders.

"A defendant challenging the sufficiency of the evidence bears a very heavy burden." *United States v. Warshak*, 631 F.3d 266, 308 (6th Cir. 2010) (quoting *United States v. Prince*, 214 F.3d 740, 746 (6th Cir. 2000)). The relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). A judgment will be reversed for insufficiency of the evidence only if it is shown not to be supported, on the record as a whole, by competent and substantial evidence. *Id.*

**1. *Elements of the Offenses***

In evaluating Chew's arguments that the evidence was insufficient to sustain the convictions, we begin our "any rational trier of fact" assessment with reference to the elements of the charged offenses and definitions given in the jury instructions. Chew has not challenged the jury instructions on appeal. In the excerpts provided below, the elements that are the focus of Chew's appellate arguments are highlighted.

(a) *Money Laundering*

As to the elements of the count 1 money laundering charge, the district court instructed the jury as follows:

Count 1 of the superseding indictment charges the Defendant, Gregory S. Chew, with engaging in a monetary transaction in violation of Federal law. For you to find the Defendant, Gregory S. Chew, guilty of this crime you must find that the Government has proved each and every one of the following elements beyond a reasonable doubt. First, that the Defendant Gregory S. Chew knowingly engaged in a monetary transaction. Second, that *the monetary transaction was in property derived from a specific unlawful act, namely, mail fraud or wire fraud*. Third, that the property had a value greater than $10,000, fourth that *the Defendant knew that the transaction was in criminally derived property*, fifth, that the monetary transaction took place within the United States.

R. 139, Trial Tr. vol. X, Page ID ## 2893-94 (emphasis added).

(b) *Mail Fraud*

The district court gave the jury the following instruction on the elements of mail fraud:

With regard to Counts 28, 29, and 30, the mail fraud counts, the Defendant, Gregory S. Chew, is charged with the crime of mail fraud in Counts 28, 29 and 30. For you to find the Defendant guilty of mail fraud on either of Counts 28, 29 or 30 you must find the Government had proved each and every one of the following elements beyond a reasonable doubt. First, that the Defendant, Gregory S. Chew, *knowingly participated in, devised and intended to – participated in devised, intended to devise a scheme to defraud in order to obtain money or property*.

Second, that the scheme included a material misrepresentation or a concealment of a material fact.

Third, that the Defendant, Gregory S. Chew, *had the intent to defraud*.

And fourth that the Defendant, Gregory S. Chew used the mail or caused another to use the mail, mail in furtherance of the scheme.

*Id.* at Page ID # 2910 (emphasis added).

(c) *Wire Fraud*

As to the wire fraud offenses charged in counts 32, 33 and 34, the district court

instructed:

For you to find . . . Defendant guilty of wire fraud you must find that the Government has proved each and every one of the following elements beyond a reasonable doubt. That the Defendant( ) Gregory S. Chew . . . *knowingly participated*

> *in, devised and intended to devise a scheme to defraud* in order to obtain money or property. That the scheme included a material misrepresentation or concealment of a material fact, and that the Defendant *had the intent to defraud*. And that the Defendant used wire communications, caused another to use wire communications in interstate commerce in furtherance of the scheme.

*Id.* at Page ID ## 2916-17 (emphasis added; references to co-defendant Pierson omitted).

> (d) *Conspiracy*

> A conspiracy is a kind of criminal partnership. For you to find . . . the Defendant( ) guilty of the conspiracy charge the Government must prove each and every one of the following elements beyond a reasonable doubt.
> First, that from or on about July 15th, 2003 and continuing up to and including July 15th of 2009 *two or more persons conspired or agreed* to commit the crime of money laundering with the intent to promote, the carrying on of a specified unlawful activity, namely, mail fraud, wire fraud or money laundering in violation of 18 United States Code, 1956, (a) (1) (A) (i) and 18 United States Code 2, knowingly engage in a monetary transaction, with the United States in property within the United States in property with a greater value than $10,000 which was derived from making false statements on loan applications, mail fraud and wire fraud, all in violation of 18 United States Code 1957.
> Second, that Gregory S. Chew . . . *knowingly and voluntarily joined the conspiracy.*

*Id.* at Page ID ## 2901-02 (emphasis added; references to co-defendant Pierson omitted).

## 2. *Evidence of Intent to Defraud*

Chew correctly argues that proof of his participation in mail fraud or wire fraud is a necessary predicate of the alleged money laundering offense, which is the object of the alleged conspiracy offense. He also correctly contends that both of these predicate offenses require proof of intent to defraud. Chew further argues that evidence that he gave down payment monies to borrowers does not make out a criminal offense and does not, in itself, tend to show intent to defraud. Evidence that the source of the borrowers' down payment monies was known to co-defendant Richard Confer but

not disclosed to the lenders is relevant, he contends, only if there was a legal duty to disclose. And although there was evidence that Confer knew of *his* duty, as mortgage broker, to disclose such information, there is no evidence that he communicated such knowledge to Chew or that Chew otherwise knew of Confer's duty. Absent evidence that he knew of such a duty, Chew contends the record fails to substantiate the finding that he concealed the information for the purpose of defrauding the lenders.[1]

The record evidence, whether direct or circumstantial, tending to show Chew intended to defraud lending institutions by surreptitiously providing down payment monies to borrowers is not overwhelming. However, when the record is viewed as a whole in the light most favorable to the prosecution—with particular attention to Confer's testimony—a picture begins to emerge that would warrant a rational jury finding that Chew acted with intent to defraud.

Confer testified that he, as mortgage broker, and Chew, as "facilitator," collaborated on more than sixty loan transactions during a five-year period. He testified about the importance of the amount and source of the borrower's down payment, required to be reported in the standard Form 1003 mortgage loan application. This information tells the prospective lender about the extent of the borrower's interest in the subject property, i.e., the borrower's "equity" or "skin in the game." Confer knew—because Chew told him so—that Chew had provided the down payment money to

---

[1]In addition, Chew makes a one-sentence argument regarding the conspiracy conviction, contending "no one testified that the borrowers or Mr. Confer conspired with Mr. Chew." Appellant's brief at 52. The argument is not developed and merits no further attention. *See United States v. Winkle*, 477 F.3d 407, 421 (6th Cir. 2007) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

prospective borrowers. In these transactions, Confer knew that the loan applications submitted to the lenders did not disclose that Chew was the source of the down payment funds. Confer considered the omission of this information to be an act of deceit, a misrepresentation, but he presented the applications anyway because he wanted the applications to be approved so he would make his one-to-five percent broker fee. Similarly, when the sales transactions were closed, settlement papers were produced which also failed to disclose Chew's provision of the down payment monies, and failed to accurately disclose the fees paid by sellers to Chew for his services. Confer said that all sixty or so mortgage transactions that he and Chew had collaborated on were marked by such omissions—omissions that he considered to be deceitful misrepresentations. Confer also explained that he had, in relation to these transactions with Chew, pleaded guilty to conspiracy to launder money. He pleaded guilty because he was in fact guilty—guilty of conspiring with Chew to launder money—and he wanted to put this matter behind him.

The government's proofs also included the testimony of representatives from several of the lending institutions. Marta McCall was responsible for risk management and quality control at American Mortgage Network, the lender that issued the mortgage on one of the subject properties. McCall explained that American Mortgage Network would rely on the accuracy of the down payment information reflected in the Form 1003 loan application as reflecting the borrower's equity, i.e., the borrower's incentive to repay the loan. She testified that if American Mortgage had known that the borrower's down payment money had been provided to the borrower 24 to 48 hours prior to the closing, the loan would have been denied—not even a close question.

Kevin Walsh, of CIT Group (which had also provided a mortgage on one of the subject properties), corroborated McCall's testimony regarding the importance of the borrower's "skin in the game." In fact, Walsh explained that the importance of this factor is magnified in relation to investment property. Whereas the mortgagor of owner-occupied property has two reasons to repay the loan—avoiding financial loss and avoiding homelessness—Walsh explained that the investment property borrower is only concerned to avoid financial loss. Hence, it is that much more important to the lender, in gauging risk, that the down payment on the purchase of investment property come from the borrower's own funds.

Finally, Stephen Newcomb was employed by Argent Mortgage Company as a repurchase title claims manager. He testified regarding Argent's issuance of mortgages on two of the subject properties. He testified that if Argent had known that the borrowers had not actually paid any of the down payment monies, the loans would have been denied.

The contours of the transactional context were defined and corroborated by additional testimony as well—all undisputed. Granted, the record does not appear to include evidence that Chew made any affirmative misrepresentations about the source of down payment monies. Nor is there evidence that Confer expressly advised Chew that his practice—i.e., "fronting" down payment monies to buyers so that he could be reimbursed by the sellers, with a dividend, when the mortgage was improved—was unlawful. Yet, when the record is viewed as a whole, a picture emerges from which a rational trier of fact could reasonably conclude that the "intent to defraud" element of each of the convicted offenses was proved. As explained below, we find a few salient jury instructions and legal standards defining the elements of the offenses to be of particular significance.

### 3. *Applying Law to Facts*

First, in relation both to mail fraud and wire fraud, there is no technical or precise definition

of an unlawful "scheme to defraud." "The standard is a reflection of moral uprightness, of

fundamental honesty, fair play and right dealing in the general and business life of members of

society." *United States v. Daniel*, 329 F.3d 480, 486 (6th Cir. 2003) (internal quotation marks and

citation omitted); *Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987) (noting that mail and wire

fraud statutes share the same language in relevant part and that the same legal analysis applies to

both offenses). An unlawful scheme to defraud may consist of "concealment of a material fact."

R. 139, Trial Tr. vol. X, Page ID # 2910. Further, as the district court instructed:

> A scheme to defraud includes any plan or course of action by which someone
> intends to deprive another of money or property by means of false or fraudulent
> pretenses, representations or promises. The term false or fraudulent pretenses,
> representations or promises means any false statements or assertions that concern a
> material aspect of the matter in question that were either known to be untrue when
> made or made with reckless indifference to their truth. They include actual direct
> false statements, as well as half truths and the knowing concealment of material facts.
> An act is knowingly done if it is done voluntarily and intentionally and not
> because of mistake or some other innocent reason.
> A misrepresentation or concealment is material if it has a natural tendency to
> influence or is capable of influencing the decision of a person of ordinary prudence
> and comprehension.

*Id.* at 2911.

The district court defined "intent to defraud" as "intent to deceive or cheat for the purpose

of either causing a financial loss to another or bringing about a financial gain to one's self [or] to

another person." *Id.* at 2911-12. To satisfy this element, the evidence had to show not only that

there was a material misrepresentation or knowing omission of material fact, but also that the

misrepresentation or omission was made with the purpose of inducing the victim to part with money or property or to undertake some action that would not otherwise have been undertaken. *Daniel*, 329 F.3d at 487.

Significantly, the jury was also instructed that Chew could be found guilty of mail fraud and/or wire fraud as an aider and abettor, without having "personally committed the crime," if he was found to have "intentionally helped or encouraged someone else to commit the crime." R. 139, Trial Tr. vol. X, Page ID ## 2912-13, 2919-20.

Given the undisputed testimony of the lending institution representatives about the materiality and importance of information regarding the borrowers' equity in the property purchased in assessing risk and approving loan applications; and given Confer's testimony about his knowing and deceptive concealment or nondisclosure of Chew's practice of surreptitiously gifting down payment monies to borrowers just prior to the closings to enhance the borrowers' apparent creditworthiness and improve the likelihood of mortgage approval; and given the extent of Chew's collaboration with Confer in more than sixty such transactions, it is apparent that a rational juror could reasonably conclude beyond a reasonable doubt that Chew had intentionally helped or encouraged Confer to obtain money from lenders by a scheme that included half-truths and omission/concealment of material facts. The record thus includes sufficient evidence to establish the required "intent to defraud" element of the predicate mail fraud and wire fraud offenses. Chew's only sufficiency-of-the-evidence challenge therefore fails.

Although the evidence against Chew was not overwhelmingly strong on all essential elements, considering the broad nature of some elements of the charged offenses and the deferential

standard of review, Chew has failed to carry his heavy burden of demonstrating insufficiency of the evidence to support the convictions. It follows that all eight convictions, on one count of money laundering, one count of conspiracy to launder money, and three counts each of mail fraud and wire fraud, must be affirmed.

## C. Sentencing Issues

The court reviews the judgment of sentence under the abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 46, 51 (2007). A sentence may be vacated under this standard only if it is found to be procedurally or substantively unreasonable. *Id.* at 51-52; *United States v. Peebles*, 624 F.3d 344, 347 (6th Cir. 2010). Chew contends the sentence imposed is procedurally unreasonable in three respects. A sentence may be deemed procedurally unreasonable if the district court failed to calculate or improperly calculated the applicable advisory Sentencing Guidelines range, treated the Guidelines as mandatory, failed to consider the factors prescribed at 18 U.S.C. § 3553(a), selected the sentence based on erroneous facts, or failed to adequately explain the sentence. *Gall*, 552 U.S. at 51; *Peebles*, 624 F.3d at 347. In evaluating the correctness of the district court's calculation of the advisory Guidelines range, factual findings are reviewed for clear error and legal conclusions are reviewed de novo. *United States v. Lalonde*, 509 F.3d 750, 763 (6th Cir. 2007).

### 1. *Loss Calculation*

Chew contends the district court committed procedural error in finding that the loss attributable to Chew's misconduct amounted to $1 million. The sentencing court's determination of the amount of loss attributable to a defendant is reviewed for clear error, but the methodology for

- 15 -

calculating the loss is reviewed de novo. *Warshak*, 631 F.3d at 328. An error in calculating the loss "is a procedural infirmity that typically requires remand." *Id.*

At sentencing, the district court initially determined that Chew's base offense level was 7 under § 2B1.1(a)(1) of the Sentencing Guidelines. In applying § 2B1.1(b)(1), the district court increased Chew's base offense level by 14 levels based on the finding that Chew's offense conduct had caused loss in the estimated amount of $1 million—i.e., falling within the range of more than $400,00 but not more than $1 million, prescribed at U.S.S.G. § 2B1.1(b)(1)(H). R. 171, Sentencing Tr., Page ID ## 3736-37. This finding was made after the court conducted a lengthy evidentiary hearing on February 1, 2011, and received proposed findings and conclusions from both sides. The court explained this finding in relevant part as follows:

> Note 3 to U.S.S.G. 2B1.1 discusses the determination of the amount of loss. As a general rule, the loss is the greater of actual or intended loss. The actual loss is the reasonably foreseeable pecuniary harm that resulted from the offense. The intended loss means the pecuniary harm that was intended to result from the offense and includes intended pecuniary harm that would have been impossible or unlikely to occur. Pecuniary harm is harm that is monetary or that otherwise is readily measurable in money. Reasonably foreseeable pecuniary harm is pecuniary harm that the defendant knew, or reasonably should have known, was a potential result of the offense. Finally, the gain that resulted from the offense is used as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.
>
> A court need only to make a reasonable estimate of the loss, and the court's determination of the amount of the loss is entitled to appropriate deference.
>
> * * * *
>
> The estimated loss is to be reduced by the money returned, the fair market value of the property returned and the services rendered by the defendant to the victim before the offense was discovered. In a case involving collateral, such as this one, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral as the time of sentencing.

* * * *

> The Court accepts and adopts the Presentence Investigation Report's conclusion that Chew was responsible for 61 properties being sold due to fraudulent activity. The Court also accepts and adopts the Government's evidence that the loss attributed to these 61 properties was $2,016, 873.20. This amount is calculated by subtracting the loan amounts for the 61 sales that Chew was involved in from the later sale price or, if there was no later sale, from the 2010 Montgomery County 100% assessed value.
>
> However, the Court finds it necessary to adjust the loss attributable to Chew based upon the turmoil in the real estate market at the time, the mortgage "crisis" that existed at the time and the deplorable state of the economy at the time. After adjustment, the Court finds that Chew is responsible for $1,000,000 in loss.

R. 151, Order Finding Loss, at Page ID ## 3167-68, 3171.

Chew objected to this loss determination and maintains on appeal that the government did not carry its burden of proving loss by a preponderance of the evidence. Chew insists the government presented no evidence of actual loss suffered by any of the supposed lending institution victims. He also contends the government's evidence of the fair market value of the sixty-one collateral properties was unreliable.

The government's proposed loss calculation was based on a chart presented by IRS Special Agent Marcia Gross. The chart represents a compilation of information regarding sixty-one properties. The chart illustrates two methodologies for calculating loss:

> [First,] the amount of the original mortgage loan less the price generated by any resale, or if there was no subsequent sale, the assessed value of the property the year of the original fraudulent transaction, resulting in an estimated loss of $2,550,257.80; and [second,] the same formula substituting 2010 for the year assessed value, which resulted in a loss of $2,691,057.80.

Appellee's Brief at 57. As Chew points out, his expert, real estate appraiser Douglas Fink, explained at the loss calculation hearing that assessed values are not accurate and have limited reliability. Fink

did not otherwise take issue with the accuracy of the figures in the chart, but explained that the diminution in value of mortgaged properties in the Dayton area between 2005 and 2010 was attributable to the downturn in the real estate market, meaning that the government's proposed estimates do not reflect an accurate assessment of loss attributable to Chew's participation in the scheme.

In reconciling the parties' approaches, the district court gave partial weight to both. The court used the government's chart as its starting point and found that Chew was responsible for the losses sustained by fifteen lenders in sixty-one transactions. The court also accepted the government's proposed methodology for calculating loss. Yet, the court gave weight to Fink's opinion that much of the loss yielded by the government's methodology was attributable to market conditions and not Chew's criminal conduct. Hence, the court calculated the loss to be less than half the amount substantiated by the government's chart and methodology.

Although the government is obliged to prove loss by a preponderance of the evidence, fraud losses need not be determined with precision; a reasonable estimate will do. *United States v. Ashe*, 47 F.3d 770, 776 (6th Cir. 1995); U.S.S.G. § 2B1., Application Note 3(C). The estimate of loss must be based on available information, however, and, if it is, the district court's determination is entitled to appropriate deference. U.S.S.G. § 2B1.1, Application Note 3(C). The methodology here proposed by the government and accepted by the district court is facially plausible; it represents an estimate of loss based on available information. Yet, while the district court purportedly accepted the methodology, it did not adopt the results yielded by the methodology. The court clearly and justifiably took Fink's testimony into account in reducing the loss estimate. *See United States v.*

*Crandall*, 525 F.3d 907, 915 (9th Cir. 2008) (recognizing that there is little logic in increasing or decreasing a defendant's sentence as a result of such wholly independent and unpredictable factors as the fluctuating values in the volatile real estate market).  But Fink stopped short of proposing a different loss estimate and Chew argued simply that the loss should be calculated to be zero and his base offense level should not be increased.  Considering all these circumstances, reviewing for abuse of discretion, and deferring to the district court's assessment of the available information, we uphold the loss calculation as not having been shown to be procedurally unreasonable.[2]

## 2. *Number of Victims*

In his next claim of error, Chew contends the district court's determination of the number of victims of his misconduct was procedurally unreasonable. In applying § 2B1.1(b)(2) of the Guidelines, the district court determined that Chew's offense conduct involved fifteen lending institution victims (i.e., more than nine, but less than fifty victims), warranting a two-level increase in the base offense level.  In making this determination, the district court adopted the recommendation of the presentence report ("PSR") over Chew's objection.  The PSR recommendation, in turn, was based on trial testimony of Special Agent Marcia Gross, who had prepared spreadsheets detailing sixty-one mortgage transactions during the charged period, from which Chew had received payments out of disbursements from fifteen different lending institutions.

---

[2]This result is buttressed by harmless error analysis.  That is, even if the district court's calculation of loss were deemed to be technically wanting, we would nonetheless find no injury to Chew's substantial rights because Chew's sentence would be favorably affected only if the loss sustained by these fifteen lenders as a result of these sixty-one transactions were shown to be $400,000 or less. *See United States v. Hooker*, 456 F. App'x 549, 555 (6th Cir. 2012).  The record presented to the district court simply cannot be read as supporting that conclusion.

No. 11-3625
*United States v. Chew*

A "victim" is defined as "any person who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1(b)(2), Application Note 1. Chew contends the government failed to show that any of the fifteen lenders sustained actual loss as a result of his participation in the scheme to defraud.

This claim of error falls with resolution of the foregoing issue. Because we find no error in the district court's loss calculation (methodology and finding), its determination that the fifteen lenders sustained cognizable injury will be upheld. We find no error in the determination that the fifteen lending institutions from which Chew's scheme fraudulently obtained funds were "victims."

### 3. *Acceptance of Responsibility*

Finally, Chew argues the district court erred by denying him credit for acceptance of responsibility. At sentencing, Chew argued that his exercise of his right to trial did not automatically preclude credit for acceptance of responsibility under U.S.S.G. § 3E1.1. He cited the fact that he was acquitted of numerous charges and contended that he had expressed remorse after the jury found him guilty of some offenses. The district court summarily overruled the objection citing the rationale given in the PSR:

> Pursuant to U.S.S.G. § 3E1.1, Application Note 2, this adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Application Note 2 further notes that conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt ( *e.g.,* to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).

In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

PSR, ¶ 46. On appeal, Chew conclusorily argues that the district court erred. He contends that he was entitled to credit for acceptance of responsibility because he was truly remorseful.

The district court's denial of credit for acceptance of responsibility is reviewed with great deference; only if it is shown to be clearly erroneous will it be disturbed. *United States v. Genschow*, 645 F.3d 803, 813 (6th Cir. 2011); *United States v. Bacon*, 617 F.3d 452, 456 (6th Cir. 2010). Chew has presented no basis for finding clear error. That he "was truly remorseful" after being found guilty, even if accepted as true, does not make out the "rare situation" where a defendant should be granted credit despite having put the government to its proofs. We therefore uphold the district court's denial of credit for acceptance of responsibility.

### III. CONCLUSION

We thus reject all five of defendant Chew's claims of error. The district court's judgment is **AFFIRMED**.